**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kenyatta BRACK, Patrick Henderson, Willie Tyler, Nicholas Martinez, Maurita Stovall, and Dana Richardson, Defendants–Appellants.**

Nos. 98–2032, 98–2044, 98–2116, 98–2152, 98–2341 & 98–2438.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 25, 1999[1].

Decided Aug. 6, 1999.

---

1. Appeal No. 98–2341 was submitted for decision without argument.

749

John W. Vaudreuil (argued), Peggy A. Lautenschlager, Office of the U.S. Atty., Madison, WI, for United States.

Jordan Loeb, Curt F. Pawlisch (argued), Cullen, Weston, Pines & Bach, Madison, WI, for Brack.

James A. Maloney (argued), Barrick, Switzer, Long, Balsley & Van Evera, Rockford, IL, for Henderson.

Margaret Danielson (argued), Madison, WI, for Tyler.

Stephen J. Eisenberg (argued), Eisenberg Law Offices, Madison, WI, for Martinez.

Thomas J. Coaty, Madison, WI, for Stovall.

David A. Geier (argued), Larowe, Gerlach & Roy, Madison, WI, for Richardson.

Before BAUER, WOOD, Jr., and RIPPLE, Circuit Judges.

BAUER, Circuit Judge.

This is a consolidated direct appeal by six defendants convicted of various offenses stemming from a crack cocaine conspiracy. The defendants raise numerous issues on appeal. For the reasons stated below, we affirm in part and reverse in part.

## I. BACKGROUND

From the middle of 1995 until August 1, 1997, Christopher Bell ("Bell") led a conspiracy to distribute crack cocaine in Southern Wisconsin. On August 7, 1997, a federal grand jury sitting in the Western District of Wisconsin returned a fourteen-count indictment against eleven individuals, including Kenyatta Brack ("Brack"), Patrick Henderson ("Henderson"), Willie Tyler ("Tyler"), Nicholas Martinez ("Martinez"), Maurita Stovall ("Stovall"), and Dana Richardson ("Richardson"). Count 1 of the indictment charged all the defendants with conspiracy to distribute cocaine base and to possess cocaine base with intent to distribute, in violation of 21 U.S.C. § 846. Count 2 charged Brack with possession of cocaine base with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Finally, counts 3, 4, 5, 7, 8,

and 10 charged Richardson with possession of cocaine base with intent to distribute, and distribution of cocaine base, both in violation of 21 U.S.C. § 841(a)(1).

On January 30, 1998, Brack pled guilty to the conspiracy charge. However, he reserved the right to appeal the district court's denial of his motions to suppress evidence found when the police strip searched him, and when they searched Room 109 of the Econolodge in Beloit, Wisconsin. Also on January 30, 1998, after filing numerous pretrial motions, proposed voir dire questions, and proposed jury instructions, as well as participating in a final pretrial conference, Martinez entered a conditional plea of guilty to the conspiracy charge. Martinez's trial was scheduled to begin three days later. Finally, on March 6, 1998, Richardson pled guilty to possession of cocaine base with intent to distribute. The remaining three appellants proceeded to trial before a jury.

At trial, both Bell and Martinez testified that Tyler was a distributor for the conspiracy. Bell further testified that his relationship with Tyler began in September 1996 and continued until August 1997. However, there is some confusion about whether Tyler distributed drugs for Bell during the entire year or for only eight months. In any case, the conspiracy delivered half an ounce to an ounce of crack to Tyler each week. Bell testified that much of the crack was given to Tyler on credit, although Martinez testified that he was under the impression that Tyler usually paid Bell in advance. Finally, Bell testified that he wanted Tyler to sell drugs for him because Tyler was able to sell to people with whom Bell didn't otherwise do business.

On February 6, 1998, the jury found Henderson, Tyler, and Stovall guilty of the conspiracy charge. On March 20, 1998, Tyler submitted a six-page, single-spaced, handwritten account of his offense and contended that he qualified for sentencing under the safety valve provisions. 18

U.S.C. § 3553(f); U.S.S.G. § 5C1.2. Tyler's attorney also wrote to the government to confirm Tyler's willingness to submit to a safety valve interview. However, the government took the position that Tyler had not provided truthful information. It pointed to inconsistencies between Tyler's safety valve statement and the sworn testimony of Bell and Martinez. No interview was conducted because of the government's lack of faith in the veracity of Tyler's statement. The district court held that Tyler had not met the safety valve requirements.

Richardson's truthfulness was also called into question at sentencing. At issue was a typed statement by Richardson in which he denied that he was a member of the conspiracy, and claimed that he was merely an independent dealer who was supplied by Bell. In addition, Richardson estimated that he sold between one and one and a half ounces of cocaine a month. These assertions conflicted with statements made by Bell and Martinez to police shortly after they were arrested. Both Bell and Martinez told police that Richardson was a member of the conspiracy and that he sold between one and four ounces of cocaine a week. The district court found that Richardson was a member of the conspiracy, that his relevant conduct involved more than 1.5 kilograms of cocaine base, and that he had falsely denied relevant conduct. Accordingly, the lower court refused to reduce Richardson's offense level for acceptance of responsibility.

Martinez also experienced some difficulty at sentencing. The district court granted him a two-level sentence reduction for acceptance of responsibility, but it denied him an additional one-level reduction because he pled guilty only three days before trial. Furthermore, the court gave him a two-level sentence enhancement for possession of a dangerous weapon.

As for Stovall, her sentence was enhanced by two levels for using a minor to commit a crime. In applying the enhancement, the district court relied on recordings of two telephone conversations that took place on July 12 and July 23, 1997. During both phone calls, Stovall asked Maurice Tucker ( "Tuck"), a fourteen year old who worked for Bell's organization, to bring her some crack. The court found that these conversations showed that Stovall asked Tuck "to do work for her that involved the distribution of drugs." (Tr. vol. 3 at 28.)

The following table summarizes the offenses of conviction and sentences of the appellants.

| Appellant | Offense of Conviction | Sentence |
| --- | --- | --- |
| Brack | conspiracy to distribute & to possess with intent to distribute | 188 mo. |
| Henderson | conspiracy to distribute & to possess with intent to distribute | 360 mo. |
| Tyler | conspiracy to distribute & to possess with intent to distribute | 188 mo. |
| Martinez | conspiracy to distribute & to possess with intent to distribute | 250 mo. |
| Stovall | conspiracy to distribute & to possess with intent to distribute | 235 mo. |
| Richardson | possession with intent to distribute | 324 mo. |

## II. Discussion

### A. Brack

#### 1. Suppression of Evidence Found in Room 109 of the Econolodge

Brack's first argument on appeal is that there was no probable cause to support the search warrant for Room 109 of the Econolodge and that, consequently, the district court should have suppressed any evidence found when the room was searched. Before we discuss probable cause, however, we must address the government's contention that Brack is not entitled to challenge the existence of probable cause because he has not shown that "he personally ha[d] an expectation of privacy in the place searched, and that his expectation [wa]s reasonable." *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 472,

142 L.Ed.2d 373 (1998).[2] It is by now well-established that Fourth Amendment protections extend to temporary dwellings such as hotel rooms. *United States v. Jerez*, 108 F.3d 684, 690 n. 4 (7th Cir.1997); *Carter*, 525 U.S. 83, 119 S.Ct. at 473. However, the government's challenge puts Brack in the unhappy position of bearing the burden of proving that he was dwelling, at least temporarily, in Room 109 of the Econolodge, *see United States v. Torres*, 32 F.3d 225, 230 (7th Cir.1994), which he cannot do without seriously weakening his claim that there was no probable cause to search the room. Since we find below that there was probable cause to support the warrant, we need not address Brack's expectation of privacy further.

▮ Probable cause exists when "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996). Therefore, probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). An anticipatory warrant must be supported by probable cause "to believe that contraband will be located at the premises to be searched after certain events transpire." *United States v. Dennis*, 115 F.3d 524, 528 (7th Cir.1997). In determining whether probable cause exists, an official must consider the totality of circumstances. *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. We review determinations of probable cause *de novo*. *Ornelas*, 517 U.S. at 699, 116 S.Ct. at 1663.

▮ Brack's argument is essentially that the Rock County Court Commissioner was presented with insufficient reliable evidence to support a finding of probable cause. He notes that an official cannot merely ratify "the bare conclusions of others," *Gates*, 462 U.S. at 239, 103 S.Ct. at 2333, and that, for this reason, "[a]n officer's statement that 'affiants have received reliable information from a credible person' ... is ... inadequate," *id.* at 239, 103 S.Ct. at 2332–33; *see also United States v. Reddrick*, 90 F.3d 1276, 1280 (7th Cir.1996) (assertion by an officer testifying at a probable cause hearing that the informant provided reliable information in the past is an unsupported conclusion). The point is well taken. Therefore, we will follow the example of the lower court by discounting those portions of the affidavit that are unsupported, and by treating information obtained from "a reliable" source as information obtained from an informant "of unknown reliability."

Thus modified, the affidavit reveals that on September 20, 1996, an informant told police that drugs were being sold from Room 109 of the Econolodge. The informant also told police that Room 109 was occupied by a black man who was bald, six feet tall, and weighed 160 pounds. The police believed that the man's name was Kenyatta. Independent investigation showed that Room 109 had been rented by Selean Turner ("Turner") on September 20, 1996, and that she had reserved the room through October 13, 1996. Police observed a car registered to Turner parked nearby. On September 23, 1996, an informant made a controlled purchase of cocaine in Room 109. The man who sold the cocaine to the informant matched the description provided by the first (or same) informant. Police observed that Turner's car was parked near the room during the controlled purchase. Finally, an informant of unknown reliability told

**2.** The government purports to challenge Brack's standing. However, "in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Carter*, 525 U.S. 83, 119 S.Ct. at 472 (citing *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). *See also Terry v. Martin*, 120 F.3d 661, 664 (7th Cir.1997).

police that Anthony Smith ("Smith") (a notorious drug dealer) and "Kenyatta" would be going to Chicago to buy cocaine on September 26, 1996 and would be returning in the evening on September 27 or 28. The informant further specified that Smith and "Kenyatta" would be driving Turner's car. Based on this information, the police sought and obtained a search warrant contingent on the return of Smith and/or a black male meeting the description of "Kenyatta" to Room 109 in the evening on September 27 or 28, 1996.

In the early evening on September 27, 1996, the police observed Turner driving her own car near the hotel. They pulled her over and took her into custody for questioning. Later that evening, a man who matched the description of "Kenyatta" (and who turned out to be Kenyatta Brack) returned to Room 109. When he left the hotel in a car, the police pulled him over and took him into custody pursuant to an outstanding traffic arrest warrant. The police then executed the search warrant for Room 109, seizing drugs, a scale, a pager, and some clothes.

■ Brack contends that the information provided by the confidential informant(s) was unreliable and that, therefore, it did not provide a sufficient basis for the Court Commissioner to conclude that probable cause existed. According to the case law of this Circuit, the factors that suggest that a confidential source's information is reliable include: "(1) firsthand observation by the informant; (2) degree of detail provided; (3) corroboration of the informant's information by an officer's independent investigation and (4) the fact that the informant testified at the probable cause hearing." *Reddrick*, 90 F.3d at 1280. No one factor is dispositive, however. Each is simply a relevant consideration in the totality of circumstances analysis. *See Gates*, 462 U.S. at 233, 103 S.Ct. at 2329. Therefore, a deficiency in one factor may be compensated for by a strong showing in another or by some other indication of reliability. *Id.*

In this case, the controlled purchase on September 23, 1996 confirmed that "Kenyatta" was selling drugs out of Room 109. *See Reddrick*, 90 F.3d at 1281. In addition, the informant's prediction about "Kenyatta's" travel plans was borne out when Brack, who matched the description given by the informant, did in fact return to Room 109 in the evening on September 27, 1996. This corroboration sufficiently "reduced the chances of a reckless or prevaricating tale, thus providing a substantial basis for crediting" the informant's tip that contraband would be located in Room 109 after Smith or "Kenyatta" returned. *Gates*, 462 U.S. at 244–45, 103 S.Ct. at 2335 (internal quotation marks and citation omitted).

The reliability of the tip was further bolstered by the nature of the details provided. Although the details were relatively few, they related to future actions of third parties, which are "ordinarily not easily predicted." *Id.* at 245, 103 S.Ct. at 2336. Access to such information demonstrates a likelihood that the informant obtained his "entire story" either from Smith or Brack, or from someone they trusted. *Id.* at 246, 103 S.Ct. at 2336. *See also Alabama v. White*, 496 U.S. 325, 332, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301 (1990) ("ability to predict respondent's future behavior ... demonstrated inside information—a special familiarity with respondent's affairs"). Based on these considerations, we hold that the affidavit was sufficient to support the Court Commissioner's finding that probable cause existed to believe that contraband would be located in Room 109 if Smith or Brack returned to the room in the evening on September 27 or 28, 1996.

We are not persuaded to the contrary by the fact that Brack did not return in Turner's car as the informant predicted. In *Gates*, the informant incorrectly predicted that Mrs. Gates would return from Florida by plane after dropping off her car to be loaded with drugs. Instead, she remained with the car and drove back to Illinois

accompanied by her husband. The Supreme Court explained that informants need not be infallible, and found that the single inaccuracy was not enough to undermine the informant's credibility. *Gates*, 462 U.S. at 245 n. 14, 103 S.Ct. at 2336 n. 14. The fact that Brack was not driving Turner's car when he returned to the Econolodge is similarly inconsequential.

■ Brack next contends that the search warrant was invalid because it did not satisfy the three additional requirements for anticipatory search warrants. These requirements are: (1) that the affidavit present independent evidence that gives rise to probable cause to believe that the contraband will be located at the premises at the time of the search; (2) that the contraband be on a "sure course" to the location to be searched; and (3) that the conditions governing the execution of the warrant be explicit, clear, and narrowly drawn. *Dennis*, 115 F.3d at 528, 530. These additional requirements are necessary because "warrants conditioned on future events present some potential for abuse." *Id.* at 528.

■ We have already addressed the requirement that an affidavit in support of an anticipatory warrant show probable cause to believe that contraband will be located at the premises at the time of the search. Therefore, we proceed directly to Brack's contention that the affidavit did not establish that the drugs were on a "sure course" to Room 109 of the Econolodge. The purpose of the sure course requirement is to prevent law enforcement authorities or third parties from mailing or otherwise sending a controlled substance to a residence to "create probable cause to search the premises where it otherwise would not exist." *Id.* at 529. The requirement ensures that a sufficient nexus between the parcel and the place to be searched exists. *Id.*

When contraband is delivered to the location to be searched by controlled delivery, there is always a danger that the

government's involvement will result in drugs being sent to a location that they otherwise would not have been sent to. For example, a courier intercepted while carrying drugs might implicate someone else in order to win himself a lighter punishment. In Brack's case, however, neither the government nor a third party was involved in delivering the contraband to Room 109. The drugs were delivered by Brack himself. For this reason, we doubt that the "sure course" requirement is applicable. *See United States v. Rowland*, 145 F.3d 1194, 1203 n. 3 (10th Cir.1998) ("It is unclear how, or whether, the heightened 'sure course' requirement applies to anticipatory warrants outside the controlled delivery context."). Even if it is, the affidavit clearly demonstrated a nexus between the drugs and the hotel room when it established that Brack had been selling drugs out of Room 109, and conditioned the execution of the search warrant on Brack's return to the room after a trip to purchase drugs.

■ In Brack's final attack on the search warrant, he asserts that the triggering condition for executing the warrant was too broad. In particular, he argues that the time frame specified in the affidavit was too long. The purpose of the requirement that warrants conditioned on future events be narrowly drawn is to avoid premature execution as a result of manipulation or misunderstanding by the police. *United States v. Garcia*, 882 F.2d 699, 703–4 (2d Cir.1989); *Dennis*, 115 F.3d at 528. The condition that Smith or Brack return to Room 109 in the evening on one of two nights was sufficiently narrowly drawn to meet this objective.

Brack's reliance on the First Circuit's decision in *United States v. Ricciardelli*, 998 F.2d 8 (1st Cir.1993), as support for the contrary conclusion is misplaced given our observation that *Ricciardelli* has essentially been confined to its facts by *United States v. Gendron*, 18 F.3d 955 (1st Cir.1994). *See United States v. Leidner*, 99 F.3d 1423, 1428 (7th Cir.1996). In *Ric-*

*ciardelli*, the warrant technically allowed police to search the defendant's home as soon as he picked up a package of drugs from the post office, regardless of whether the defendant returned home with the drugs. The warrant in this case is readily distinguishable in that it was conditioned on the arrival of drugs *at the location to be searched.* For this reason, there was no danger that the police would execute the warrant prematurely. *See Ricciardelli*, 998 F.2d at 13 ("[T]he event that triggers the search must be the delivery of the contraband to the premises to be searched.").

▮ Even if the warrant was deficient in one of the ways claimed by Brack, the evidence seized during the execution of the warrant was admissible under the good faith exception to the exclusionary rule. According to the rule announced in *United States v. Leon*, "[i]n the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984). Brack has not alleged that the Rock County Court Commissioner "abandoned his detached and neutral role." Nor has he argued that the police were "dishonest or reckless in preparing their affidavit." Finally, it is clear from the preceding discussion that it was objectively reasonable for the police to believe that probable cause existed. Therefore, the district court was correct to deny Brack's motion to suppress based on the good faith exception if for no other reason.

### 2. Suppression of Evidence Seized During Strip Search

▮ Brack next challenges the denial of his motion to suppress evidence seized when he was strip searched on September 27, 1996. He argues that the strip search violated his Fourth Amendment

right to be free from unreasonable searches. To determine whether the search was reasonable, we balance the government's need to conduct the search against the invasion of Brack's personal interests. *See Kraushaar v. Flanigan*, 45 F.3d 1040, 1045 (7th Cir.1995); *Doe v. Burnham*, 6 F.3d 476, 479 (7th Cir.1993). Among the factors we consider are: "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Kraushaar*, 45 F.3d at 1045 (internal quotation marks and citations omitted). We review the district court's determination that the search was reasonable *de novo. Ornelas*, 517 U.S. at 699, 116 S.Ct. at 1663.

As we noted above, Brack was taken into custody pursuant to an outstanding traffic arrest warrant when he left Room 109 of the Econolodge on the evening of September 27, 1996. He was then taken to the Beloit Police Station while police searched his room. When he arrived at the station, he immediately asked for toilet paper so that he could relieve himself. Given that Brack was a suspect in a drug investigation, his request was met with suspicion. Officer McMahon instructed Brack to undress and turn around. When he did so, McMahon observed a piece of tissue in the crease of Brack's buttocks. At McMahon's instruction, Brack removed the tissue and two plastic bags. One bag contained cocaine and the other contained marijuana.

It is well established that "officials have a legitimate and substantial need to prevent arrestees from bringing weapons or contraband into ... a [detention] facility." *Kraushaar*, 45 F.3d at 1045. Since it was entirely reasonable for McMahon to suspect that Brack was carrying contraband in a body cavity, there was a clear need for the search. Furthermore, although it goes without saying that strip searches are highly unpleasant, the intrusiveness of this search was kept to a minimum. McMahon did not touch Brack but rather instructed

him to remove the drugs himself. Under these circumstances, the strip search was reasonable.

■ Brack's only argument to the contrary is that the search violated Wisconsin law, which requires that no strip search be conducted without written authorization from the top official of the police department. As we explained in *Burnham*, however, "a state may provide greater protections under its laws than the Constitution requires." 6 F.3d at 480. Therefore, the fact that McMahon apparently failed to follow Wisconsin's procedures for conducting strip searches does not indicate that his search of Brack was unreasonable. *See id.* (The Wisconsin legislature's sense of reasonableness cannot be grafted onto the Fourth Amendment.); *Kraushaar*, 45 F.3d at 1047 (State law is "irrelevant" to a determination of reasonableness under the Fourth Amendment.).

**B. Henderson**

**1. Suppression of Wiretap Evidence**

■ Henderson's brief incorporates by reference his arguments "outlined in extensive briefs filed in the trial court" that: (1) there was no need for a wiretap of the telephone at Vision Plus (a front business for Bell's organization); and (2) the wiretap failed to minimize interception of non-relevant communication. We decline to address these issues and by way of explanation incorporate by reference our explanation in *DeSilva v. DiLeonardi*, 181 F.3d 865, 866–68 (7th Cir.1999).[3]

**2. Mistrial**

■ Henderson's second argument on appeal is that the district court should have granted him a mistrial because Tyler's attorney implied that Henderson was a gang member during her cross-examina-

tion of Bell. The district judge is in the best position "to weigh the imponderables involved in a judgment of prejudice." *United States v. Brisk*, 171 F.3d 514, 524 (7th Cir.1999) (citing *United States v. Williams*, 81 F.3d 1434, 1440 (7th Cir. 1996)). Therefore, we review the district court's refusal to grant a mistrial for abuse of discretion.

The following exchange took place between Tyler's attorney and Bell:

Q: You testified quite awhile ago on direct examination with Mr. Vaudreuil that you wanted to sell to Mr. Tyler because he could sell to folks that you couldn't; is that correct?

A: That I didn't trust, yes.

Q: And by "folks" you meant the gang folks; right?

A: Yes.

Q: But in fact you had a whole lot of people who were members of that same organization already working for you; did you not?

A: No I did not.

Q: Well, Pat G. was.

(Tr. vol. 2 at 99.) Because Pat G. is Henderson's nickname, Henderson's attorney objected. The court denied Henderson's request for a mistrial but offered to give a corrective instruction. Henderson's attorney declined because he did not want to draw additional attention to the matter. No further mention was made of Henderson's gang affiliation. Under these circumstances, and given the substantial evidence against Henderson, Bell's comments were not so prejudicial that they deprived Henderson of a fair trial. Therefore, the district court did not abuse its discretion when it denied Henderson's request for a mistrial.

---

**3.** Although Henderson's brief does not exceed this Circuit's page limit (the brief is ten pages long and contains only two pages of argument), we recently explained that "[e]ven when a litigant has unused space ... incorporation [by reference] is a pointless imposition on the court's time." *DeSilva*, 181 F.3d at 866. We, therefore, held that "[a] brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record." *Id.*

## C. Tyler

### 1. Sufficiency of the Evidence

 Tyler's first argument on appeal is that the government proved only that he had a buyer-seller relationship with Bell, not that he was a member of the Bell conspiracy. In making this sufficiency challenge, Tyler "faces a nearly insurmountable hurdle ... [in that] we consider the evidence in the light most favorable to the Government, defer to the credibility determination of the jury, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Szarwark*, 168 F.3d 993, 995 (7th Cir. 1999) (quoting *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir.1997)).

 In *United States v. Lechuga*, we held that in order to prove conspiracy to distribute a controlled substance, the government must show the existence of "an agreement to commit a crime other than the crime that consists of the sale itself." 994 F.2d 346, 347 (7th Cir.1993) (*en banc*). An agreement "on the one side to sell and on the other to buy" does not constitute a conspiracy even if the buyer intends to resell the drugs so long as the buyer and seller do not have an agreement to further distribute the drugs. *Id.* at 349. Nonetheless, a conspiracy can consist of an "implicit understanding between the parties regarding the subsequent resale of drugs." *United States v. Hall*, 109 F.3d 1227, 1232 (7th Cir.1997). Such an understanding may be inferred from the course of dealing between two parties. *Id.* In *United States v. Berry*, we held that "[e]vidence of a conspiracy, as opposed to a buyer-seller relationship, may include transactions involving large quantities of drugs, prolonged cooperation between the parties, standardized dealings, and sales on a credit." 133 F.3d 1020, 1023 (7th Cir.1998) (internal citations omitted). If enough such evidence "point[s] in the direction of a concrete, interlocked interest beyond the consummation of the individual buy-sell deals themselves, we will not disturb the conclusion reached by the finder of fact that at some point the association blossomed into a cooperative venture." *United States v. Clay*, 37 F.3d 338, 342 (7th Cir.1994).

Viewed in the light most favorable to the government, the evidence in this case showed that Bell fronted between half an ounce and one ounce of crack per week to Tyler for at least eight months. (Tr. vol. 5 at 31–34). Furthermore, Bell testified that he agreed to sell to Tyler in order to expand the conspiracy's market, (Tr. vol. 5 at 33), suggesting a long-term arrangement. *See Lechuga*, 994 F.2d at 349 ("Suppose Lechuga had told Pinto that he needed a good distributor on the south side of Chicago and wanted to enter into a long-term relationship with Pinto to that end. Then it would be as if Lechuga had hired Pinto to assist him in reaching his market."). Finally, both Bell and Martinez testified that Tyler was a distributor for the conspiracy. Given this evidence, a rational jury could have concluded beyond a reasonable doubt that Tyler was a distributor for the Bell conspiracy.

### 2. Buyer–Seller Instruction

 In a related argument, Tyler challenges the district court's choice of buyer-seller jury instruction. Tyler's proposed instruction stated:

The mere fact that a defendant may have bought or sold cocaine [from or to] another defendant is not sufficient, without more, to establish that either defendant was a member of the conspiracy. This is true even if the defendant bought the cocaine repeatedly and resold it.

The judge gave the following instruction instead:

The existence of a mere buyer-seller relationship between a defendant and another person, without more, is not sufficient to establish a conspiracy. The fact that a defendant may have bought cocaine from another person and sold

cocaine to another person is not sufficient, without more, to establish that the defendant was a member of the charged conspiracy.

(Tr. vol. 1 at 108–9.) Thus, the controversy centers on the admonishment in the last sentence of Tyler's proposed instruction that evidence of repeated purchases of drugs for resale does not establish participation in a conspiracy.

At the outset, we note that Tyler's situation is distinguishable from that of a defendant who is not given a buyer-seller instruction at all. *See United States v. Menting*, 166 F.3d 923, 926 (7th Cir.1999). Even a defendant who is entitled to an instruction on a particular theory of defense is "not necessarily entitled to have his or her particular instruction presented to the jury." *United States v. Briscoe*, 896 F.2d 1476, 1512 (7th Cir.1990) (quoting *United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir.1987)). While we review a district court's decision not to instruct the jury on a theory of defense *de novo*, *United States v. Meyer*, 157 F.3d 1067, 1074 (7th Cir.1998), we review the language of a district court's instruction with great deference, upholding instructions "which are accurate statements of the law and which are supported by the record," *United States v. Vang*, 128 F.3d 1065, 1069 (7th Cir.1997) (internal quotation marks and citation omitted). As we stated in *United States v. McNeal*, "[w]e do not overturn convictions merely because a word or two more or less theoretically could have improved the defendant's chances of acquittal." 77 F.3d 938, 944 (7th Cir.1996). Therefore, we review only in order to ensure that the instructions as a whole treated the issue fairly and accurately. *Id.*

In this case, the instruction given by the district court was a true statement of the law. *See, e.g., Meyer*, 157 F.3d at 1074; *United States v. Hach*, 162 F.3d 937, 946 (7th Cir.1998); *United States v. Turner*, 93 F.3d 276, 285 (7th Cir.1996). However, Tyler argues that the statement was incomplete, and that accuracy and fairness required the judge to instruct that repeated purchases for resale do not establish participation in a conspiracy. While it is true that repeated transactions do not automatically establish a conspiracy, repeated sales can be significant insofar as they demonstrate prolonged cooperation that implies an agreement to distribute drugs. *Lechuga*, 994 F.2d at 349–50. *See also United States v. Thomas*, 150 F.3d 743, 745 (7th Cir.1998) (*per curiam*) ("[A] history of transactions may be evidence of conspiracy."); *United States v. Mims*, 92 F.3d 461, 463 (7th Cir.1996) (Frequent purchases of cocaine do not compel the conclusion that a defendant participated in a conspiracy; however, repeated purchases are "one indicator of a continuing agreement," and frequent purchases "may certainly be strong evidence of an agreement."). Tyler's proposed instruction was overbroad and may have led the jury to conclude that it could not consider Tyler's repeated purchases of cocaine for resale. Although Tyler now contends that his instruction was meant to convey only that evidence of repeated transactions is not sufficient *without more* to establish an agreement to distribute, it is evident that his instruction was not so limited. In any case, the district judge's instruction adequately informed the jury that Tyler could not be convicted unless the jury concluded that there was more than a mere buyer-seller relationship between Tyler and Bell. *Cf. Mims*, 92 F.3d at 465 (instruction that "[o]ne who buys from a conspirator for resale is a member of the conspiracy if he knows at least its general aims" had the effect of directing the jury to convict the defendants for conspiracy "solely on the basis of a purchase for resale"); *Thomas*, 150 F.3d at 745 (no buyer-seller instruction given). Therefore, the district court's instruction was sufficient to afford Tyler a fair trial. *See United States v. Span*, 170 F.3d 798, 801 (7th Cir.1999) (no need to instruct jury that it doesn't "matter what the buyer intended to do with the drugs

after buying them"); *United States v. Pearson*, 113 F.3d 758, 762 (7th Cir.1997) (no need to include statement that "large quantities of controlled substances, without more, cannot sustain a conspiracy conviction").

### 3. Eligibility for Safety Valve Sentencing

Tyler next argues that he was entitled to be sentenced under the safety valve provisions set forth at 18 U.S.C. § 3553(f), and U.S.S.G. § 5C1.2. A defendant who meets the requirements of these provisions must be sentenced in accordance with the Sentencing Guidelines, and is exempt from any otherwise applicable statutory minimum sentence. In addition, if the defendant's offense level is 26 or higher, the court will reduce the level by two pursuant to U.S.S.G. § 2D1.1(b)(6). To be eligible for these benefits, a defendant must prove by a preponderance of the evidence, *United States v. Ramirez*, 94 F.3d 1095, 1101 (7th Cir.1996), that he has met the following five criteria:

(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in death or serious bodily injury to any person;

(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

18 U.S.C. § 3553(f). *See also* U.S.S.G. § 5C1.2. The district court held that Tyler had not met the fifth criterion because he had not truthfully provided the government with all the information and evidence he possessed. We review the district court's factual findings for clear error and its interpretation of the safety valve provisions *de novo*. *See Ramirez*, 94 F.3d at 1099.

The transcript of Tyler's sentencing hearing reveals that the district judge was uncertain about whether Tyler had a motivation to lie in his safety valve statement. The judge stated that "it just [didn't] make sense to [him] that Mr. Tyler was being untruthful" because the alleged lies "didn't affect the calculation of relevant conduct." (Tr. vol. 4 at 35.) The judge did speculate briefly that Tyler might have been motivated to lie in order to maximize his chances on appeal. (Tr. vol. 4 at 36). However, the judge did not decide whether Tyler had been truthful, explaining that he was "a little more troubled about the fact that Mr. Tyler confined his statement to just what was known at trial." (Tr. vol.4 at 36.) Ultimately, the court found that Tyler's statement was not "the outpouring of information and evidence that ... is required under the safety valve," and that "[t]he import and the intent of [Tyler's] statement seem[ed] to be to explain what [Tyler] did or didn't do and to somehow to some extent minimize his involvement in th[e] conspiracy." (Tr. vol. 4 at 37–38.) The judge concluded: "I'm just not persuaded that the defendant has made the showing that I believe is his burden to

make to show that he's entitled to the safety valve." (Tr. vol. 4 at 38.)

Because the district court based its decision on the incompleteness of Tyler's statement rather than on its untruthfulness, the issue before us is whether, assuming that Tyler's written statement was truthful, the statement combined with Tyler's offer to submit to a safety valve interview satisfied the safety valve disclosure requirement. Tyler, of course, argues that he should not be penalized for the government's unwillingness to meet with him. The government, for its part, contends that because it believed that Tyler's statement was not truthful, it was under no obligation to follow up with an interview. This argument confuses the issues. Although the government was not required to give Tyler a second chance to tell the truth, it could not complain of incompleteness when it refused to allow him to finish telling his story. As the Fourth Circuit noted in *United States v. Beltran–Ortiz*, "[d]ebriefing by the Government plays an important role in permitting a defendant to comply with the disclosure requirement of the safety valve provision *and in convincing the Government [and court] of the fullness and completeness of a defendant's disclosure.*" 91 F.3d 665, 669 (4th Cir.1996) (emphasis added). *See also United States v. Montanez*, 82 F.3d 520, 523 (1st Cir. 1996) (noting disadvantage of relying on a written proffer rather than submitting to a safety valve interview).

■ Nonetheless, a defendant cannot satisfy the disclosure requirement simply by notifying the court of his willingness to submit to a safety valve interview. *See United States v. Ortiz*, 136 F.3d 882, 884 (2d Cir.1997) (*per curiam*). The defendant "is squarely responsible for providing, completely and truthfully, by the time of sentencing, all the evidence and information he has." *Ramirez*, 94 F.3d at 1100. *See also United States v. Adu*, 82 F.3d 119,

124 (6th Cir.1996) (The safety valve provisions "clearly require an affirmative act by the defendant truthfully disclosing all the information he possesses that concerns his offense or related offenses."); *United States v. Ivester*, 75 F.3d 182, 184–85 (4th Cir.1996) (The "plain and unambiguous language [of the safety valve provisions] obligates defendants to demonstrate, through affirmative conduct, that they have supplied truthful information to the Government."). In this case, however, Tyler acted affirmatively by inviting the government (in writing) to interview him. The government rebuffed him. Under these circumstances, Tyler's written statement (if truthful) combined with his offer to meet with the government satisfied the safety valve disclosure requirement. *See Ortiz*, 136 F.3d at 884 (distinguishing *Ortiz* from cases in which there is "a rebuff by the government when [the defendant seeks] to provide the requisite information.").[4]

## D. Martinez

### 1. Weapons Enhancement

■ During the execution of a search warrant at Martinez's home, police found an unloaded handgun and two unloaded rifles. In addition, it is undisputed that guns were stored at a stash house to which Martinez had access. Based on these facts, the district court enhanced Martinez's sentence by two levels for possession of a dangerous weapon. *See* U.S.S.G. § 2D1.1(b)(1). Martinez challenges the enhancement on the grounds that he did not possess the weapons found at his home, either actually or constructively, but was merely storing them at Bell's request. We review the district court's application of the weapons enhancement for clear error.

■ A weapons enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) is applica-

---

4. Given this holding, we need not address Tyler's related claim of ineffective assistance of counsel.

ble when: " (1) the defendant possessed a weapon, either actually or constructively, *United States v. Adams*, 125 F.3d 586, 597 (7th Cir.1997), and (2) the weapon was present during any relevant conduct, "unless it is clearly improbable that the weapon was connected with the offense," U.S.S.G. § 2D1.1(b)(1), Application Note 3; *Adams*, 125 F.3d at 596–97. The government need not show that the weapon was present during a specific transaction. *Id.* Finally, a defendant "can be held responsible for a co-defendant's possession of a weapon if that possession was in furtherance of . . . jointly undertaken criminal activity and was reasonably foreseeable by the defendant." *United States v. Taylor*, 111 F.3d 56, 59 (7th Cir.1997). *See also United States v. Berchiolly*, 67 F.3d 634, 640 (7th Cir.1995).

At sentencing, the district court held that "it d[id]n't really matter whether Mr. Martinez had personal control over the guns [because] [i]t was reasonably foreseeable to him that Mr. Bell kept firearms in connection with the conspiracy." (Tr. vol. 2 at 11.) This holding was not clearly erroneous. It is undisputed that Bell owned the weapons kept at the stash house; and "guns found in close proximity to illegal drugs are presumptively considered to have been used in connection with the drug trafficking enterprise." *Adams*, 125 F.3d at 597. Furthermore, Martinez knew about the weapons at the stash house. For these reasons, Martinez's assertion that he did not posses the weapons found at his house does not help him, even if true.

## 2. Acceptance of Responsibility

 Martinez next challenges the district court's refusal to grant him an additional one-level reduction for timely acceptance of responsibility. Under the Sentencing Guidelines, a defendant who "clearly demonstrates acceptance of responsibility for his offense," is entitled to a two-level sentence reduction. U.S.S.G. § 3E1.1(a). A defendant who qualifies for this two-level decrease and whose offense level was greater than 16 prior to the decrease, is eligible for an additional one-level decrease if the defendant has "assisted authorities in the investigation or prosecution of his own misconduct" by either:

(1) timely providing complete information to the government concerning his own involvement in the offense; or

(2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently.

U.S.S.G. § 3E1.1(b). It is the defendant's burden to establish by a preponderance of the evidence that he is entitled to the additional reduction. *United States v. Wetwattana*, 94 F.3d 280, 285 (7th Cir. 1996). We review the district court's determination of acceptance of responsibility for clear error.

 It is undisputed that Martinez fully cooperated with the government after his guilty plea. Therefore, the only issue for our consideration is the timeliness of Martinez's cooperation and plea. As a rule, "conduct qualifying for a decrease in offense level under subsection (b)(1) or (2) will occur particularly early in the case." U.S.S.G. § 3E1.1(b), Application Note 6. However, the timeliness requirement for an additional acceptance of responsibility reduction is defined in functional rather than in temporal terms. *Wetwattana*, 94 F.3d at 285.

Most of the parties' arguments have focused on the timeliness of Martinez's guilty plea under § 3E1.1(b)(2). The government points out that because Martinez pled guilty three days before trial, it was forced to prepare a case against him, and then had to revamp its trial strategy as to the remaining defendants on extremely short notice. Furthermore, the timing of the plea made it necessary for the government to respond to Martinez's numerous

pretrial motions. Martinez argues that the government had to prepare for trial anyway because four of his co-defendants proceeded to trial. As we explained in *United States v. Francis*, this argument is unavailing. "Even though a trial was to be held anyway for the other ... defendants, the government was obviously forced to specifically prepare for each and every defendant." *United States v. Francis*, 39 F.3d 803, 808 (7th Cir.1994). Therefore, the district court's holding that Martinez's guilty plea was untimely for purposes of § 3E1.1(b)(2) was not clear error.

 Martinez's cooperation with the government also came too late to qualify him for an additional acceptance of responsibility reduction. Section 3E1.1(b)(1)'s requirement that a defendant timely provide the government with complete information concerning his own involvement in the offense must be viewed in light of the broader requirement that the defendant assist authorities in the investigation or prosecution of his own misconduct. *See United States v. Lancaster*, 112 F.3d 156, 158 (4th Cir.1997) ("The key inquiry in determining whether a defendant qualifies for a reduction under § 3E1.1(b)(1) is whether the defendant provides information in sufficient time to aid the Government in the investigation or prosecution of the case."). Therefore, a defendant who "delays the disclosure of information to the Government until shortly before a scheduled trial does not qualify for [a § 3E1.1(b)(1) ] reduction." *Id.* at 158–59. Even if we accept Martinez's assertion that he was debriefed by the DEA four days before trial, the district court's determination that Martinez's cooperation was not so timely as to justify an additional one-level reduction for acceptance of responsibility was not clearly erroneous.

## E. Stovall

### Enhancement for Use of a Minor

 Stovall's sole argument on appeal is that her sentence should not have been enhanced, pursuant to U.S.S.G.

§ 3B1.4, for using a minor to commit a crime. We review the district court's interpretation of U.S.S.G. § 3B1.4 *de novo*.

U.S.S.G. § 3B1.4 provides for a two-level sentence enhancement "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense." The phrase " '[u]sed or attempted to use' includes directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." U.S.S.G. § 3B1.4, Application Note 1. Stovall argues that under our decision in *United States v. Porter*, 145 F.3d 897 (7th Cir.1998), a district court may only enhance a defendant's sentence for use of a minor if the court finds that the defendant is responsible for involving the minor in the crime, that the defendant occupied a position of trust with respect to the minor, and that the minor's involvement in the crime was unwitting. However, *Porter* announces no such requirements. In fact, *Porter* is not about the enhancement for use of a minor, which was not in effect at the time Porter was sentenced, but about the propriety of upwardly departing to account for the use of a minor in the absence of an enhancement provision. For this reason, *Porter* does not address what it means to "use" a minor to commit a crime.

In this case, a wiretap twice intercepted phone calls by Stovall to Tuck, who was fourteen years old. During each call, Stovall placed an order for crack cocaine with Tuck, and requested that he deliver the drugs to her home. Based on this evidence, the district court found that Stovall had asked Tuck "to do work for her that involved the distribution of drugs." (Tr. vol. 3 at 28.) The fact that Tuck was a high-ranking, salaried member of Bell's organization is irrelevant. The district court did not err in concluding that Stovall used Tuck in the commission of a crime.

## F. Richardson

### 1. Relevant Conduct

 The Sentencing Guidelines provide that, "in the case of a jointly under-

taken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Thus, in a conspiracy situation, a defendant is accountable for the conduct of others if the conduct was "(i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1), Application Note 2. In the case of a jointly undertaken offense involving controlled substances, "the defendant is accountable for all quantities of contraband with which he was directly involved and ... all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." U.S.S.G. § 1B1.3(a)(1), Application Note 2. The district court found that Richardson was a member of the Bell conspiracy, and consequently that his relevant conduct involved more than 1.5 kilograms of cocaine base. Richardson attacks this relevant conduct calculation by insisting that he was an independent dealer, not a member of the Bell conspiracy. We review for clear error.

Shortly after they were arrested, Bell and Martinez told police that: Richardson was a salaried member of the conspiracy who made $300–$500 a week; the conspiracy provided Richardson with an apartment and a vehicle; Bell paid Richardson's bail when Richardson was arrested for selling crack in January of 1997; and Richardson sold between one and four ounces of crack a week for the conspiracy. In a four-page written statement, Richardson denied these assertions and claimed that he was merely an independent dealer whose drugs were supplied by Bell. Furthermore, he estimated that he sold one to one and a half ounces of cocaine a month.

At his sentencing hearing, Richardson argued that Bell's and Martinez's unsworn statements were inconsistent with their sworn testimony at trial. More specifically, Richardson pointed out that neither Bell nor Martinez mentioned him when they were asked to list the salaried members of the conspiracy under oath. The district court was unimpressed by this omission, however, reasoning that "because Mr. Richardson was not one of the defendants that was standing trial at the time ... [t]here was no reason for Mr. Bell or Mr. Martinez to talk about Mr. Richardson." (Tr. vol. 1 at 23.) Consistent with this interpretation, the record shows that when Bell was specifically asked about Richardson during cross-examination by Tyler's counsel, Bell stated that he paid Richardson a salary during the time that Richardson was a part of the organization. (Tr. vol. 2 at 92–93.) Richardson's attempt to bolster the credibility of his own story by offering his landlord's affidavit to show that he had been paying his own rent also fell flat. The district court found that the affidavit showed only that Bell did not pay Richardson's rent directly, but did not preclude the possibility that Bell gave Richardson money to pay his rent.

Given these conflicting accounts of Richardson's involvement in the conspiracy, the district court was called upon to make a credibility determination—the type of determination to which we give the utmost deference. See Brisk, 171 F.3d at 526. The court concluded that Bell and Martinez were more credible than Richardson. (Tr. vol. 1 at 23.) This was not clear error. In fact, we have said before that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." United States v. Hickok, 77 F.3d 992, 1007 (7th Cir.1996) (internal citation omitted). See also Brisk, 171 F.3d at 526 (no clear error in calculation of relevant conduct when calculation was based on testimony of a codefendant that the sentencing court found to be credible).

## 2. Acceptance of Responsibility

Unlike Martinez, Richardson did not even receive the two-level sentence reduction for acceptance of responsibility, let alone the additional one-level reduction for timely pleading guilty or providing complete information to the government. U.S.S.G. § 3E1.1. The district court declined to reduce Richardson's sentence on the grounds that Richardson had falsely denied relevant conduct. *See* U.S.S.G. § 3E1.1(a), Application Note 1(a) ("A defendant who falsely denies ... relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."). Again the standard of review is clear error. Therefore, our conclusion, in the previous section, that the district court did not clearly err in calculating Richardson's relevant conduct, notwithstanding Richardson's denial of such conduct, is dispositive.

### Conclusion

The district court's judgment is Affirmed in all respects except that Tyler's sentence is Vacated and his case is Remanded for re-sentencing consistent with the views expressed in this opinion.