**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 29, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

GREGORY H. STEPHENSON,

    Defendant-Appellant, _____

_____

UNITED STATES OF AMERICA,

    _____Plaintiff-Appellee,

v.

ALTON STANLEY,

    _____Defendant-Appellant.

No. 05-3165

No. 05-3172

**APPEALS FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 02–CR-40122-01-SAC)**
**(D.C. No. 02-CR-40122-02-SAC)**

Michael S. Holland of Holland and Holland, Russell, Kansas, for Defendant-Appellant Stephenson.

Melody Evans, Assistant Federal Public Defender (David J. Phillips, Federal Public Defender, with her on the brief), Topeka, Kansas, for Defendant-Appellant Stanley.

James Brown, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the brief), Topeka, Kansas, for Plaintiff-Appellee.

Before **McCONNELL**, **BALDOCK**, and **TYMKOVICH,** Circuit Judges**.**

**BALDOCK**, Circuit Judge.

A Kansas state trooper uncovered approximately sixty kilograms of cocaine hidden in a compartment underneath the bed of a truck in which Defendants Gregory Stephenson and Alton Stanley were traveling. A grand jury indicted Defendants on charges of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1); and conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846. After the district court denied their respective motions to suppress, Defendants entered conditional pleas of guilty. See Fed. R. Crim. P. 11(a)(2). Defendant Stanley pled guilty to both charges while Defendant Stephenson pled guilty to the possession charge. The district court sentenced them to 54 months and 151 months imprisonment respectively. Defendants then filed separate appeals challenging the denial of their motions to suppress. Stanley also challenges the district court's calculation of his sentence. We consolidated the two appeals for oral argument and now dispose of them jointly. See Fed. R. App. P. 3(b)(2). We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2), and affirm.

I.

The following undisputed facts are taken from the transcript of the suppression hearing at which only the arresting officer testified. On the morning of September 27, 2002, Sergeant Kelly Schneider was patrolling Interstate 70 in Russell County, Kansas, when he

2

observed a Ford F-250 pickup truck traveling eastbound. According to Sergeant Schneider, the truck caught his attention because he saw a "major kink in the vehicle." The "kink" led Sergeant Schneider to believe the vehicle might have a false compartment.[1] Sergeant Schneider pulled up alongside to get a closer look. He observed a number of discrepancies that heightened his suspicion. Sergeant Schneider testified the bed of the truck was not the same shade of white as the cab. This indicated one of the two had been repainted. Furthermore, the bed was not aligned with the cab, an alteration that in the officer's experience indicated the existence of a hidden compartment. And the rear fender wells were painted black, which was odd because absent an undercoating, the fender wells are typically painted the same color as the vehicle. Sergeant Schneider also testified he observed too much metal inside the fender well, which indicated altered placement of the bed. Based on his observations, Sergeant Schneider decided to stop the truck and investigate.

When Sergeant Schneider approached the cab of the truck, he noticed a fresh weld between the bed and the cab of the truck. This increased his suspicion of a false

---

[1] Sergeant Schneider explained how the "kink" was indicative of a false compartment:

> "[I]n order to build a compartment in the bed of the truck, they have to raise the bed of the truck. So they raised it up two or three inches depending on the depth of the compartment. In order to make that look right on a vehicle they'll raise the back of the cab up . . . to make it look like the lines match up on the pickup. Well at a distance you can tell there's an obvious kink in [the] vehicle because the cab comes from the front, comes up, and the bed comes up from the other way to level[.]"

3

compartment because, according to Sergeant Schneider, "there shouldn't be a weld in there at all." Sergeant Schneider explained the weld could not have been made unless the bed of the truck had been removed. Sergeant Schneider testified that at that point he knew, based on his experience with "other compartments like this," that the truck had a false compartment. Sergeant Schneider told the driver Stanley and his passenger Stephenson that he believed the bed of the truck had a false compartment. Sergeant Schneider ordered Defendants to stand in front of the truck. Sergeant Schneider then walked to the rear of the truck, dropped the tailgate, and performed what he calls a "two-finger test" to determine the depth of the truck's bed. He placed one finger on top of the truck's bed and one finger from his other hand underneath the truck's bed to determine the width between the two fingers. Sergeant Schneider testified to the presence of a three inch space between the two fingers. This was significantly larger than the space required by the sheet of metal on the truck's bed as originally manufactured. Sergeant Schneider explained that "there should be one sheet of metal in the bed of that truck and . . .your finger[s] should . . . touch . . . . When you take one finger on top and one on the bottom there's an actual three-inch void in there which indicated to me that the compartment was there." Based on his belief that the truck contained a false compartment and his experience that most false compartments contain narcotics, Sergeant Schneider placed Defendants under arrest. Sergeant Schneider retrieved a drug canine from the patrol car and deployed him around the truck. The canine alerted. Discovery of the cocaine soon followed. Based on factual findings consistent with the foregoing, the district court denied the Defendants' motions to suppress.

4

II.

Defendants raise numerous challenges to the district court orders denying their respective motions to suppress. When reviewing such orders, we consider the totality of the circumstances. We view the evidence in the light most favorable to the Government and accept the court's factual findings unless clearly erroneous. See United States v. Rosborough, 366 F.3d 1145, 1148 (10th Cir. 2004). The witnesses's credibility and the weight to be given evidence, together with all inferences and conclusions drawn from the evidence, are matters within the province of the district judge. Id. The ultimate determination of reasonableness under the Fourth Amendment, however, is a question of law reviewable de novo. Id.

A.

Defendant Stephenson first argues the district court erred in finding Sergeant Schneider had reasonable suspicion to initiate a traffic stop. He contends an officer's mere observation of modifications to a vehicle is, in the absence of other suspicious factors, insufficient to create a reasonable suspicion of criminal activity and thus justify the stop. Traffic stops are seizures within the meaning of the Fourth Amendment analogous to investigative detentions. See United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005). The principles governing investigative detentions outlined in Terry v. Ohio, 392 U.S. 1 (1986), govern the lawfulness of traffic stops. See United States v. Holt, 264 F.3d 1215, 1228 (10th Cir. 2001). Under Terry, an investigative detention is proper when the detaining

5

officer has a reasonable suspicion that criminal activity may be afoot. See United States v. Arvizu, 534 U.S. 266, 273 (2002). We evaluate the officer's conduct "in light of common sense and ordinary human experience," deferring to "the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." United States v. McRae, 81 F.3d 1528, 1534 (10th Cir. 1996) (internal quotation marks and citations omitted).

Contrary to Stephenson's argument, we have previously held an officer's observation of structural modifications to a vehicle can *alone* give rise to reasonable suspicion, and thus justify a stop, when the modifications are such that a well-trained officer may reasonably believe a crime is being committed. See United States v. Orregon-Fernandez, 78 F.3d 1497, 1504-05 (10th Cir. 1996); see also United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997). In the context of vehicle modifications, we explained: "The trooper must go beyond the inarticulable hunch that all customized vehicles contain hidden compartments and point to specific factors which justify the objectively reasonable conclusion that particular alterations indicate a hidden compartment which may contain contraband." Orregon-Fernandez, 78 F.3d at 1505.

Applying this standard to the facts before us, we have no trouble concluding Sergeant Schneider's observations gave rise to a reasonable suspicion that the truck had a false compartment containing contraband. Prior to stopping the truck, Sergeant Schneider observed several modifications to the truck which supported his suspicion. Among them were an obvious height difference between the bed of the truck and the cab of the truck; the difference in the shade of color between the cab and the bed of the truck; the fact the fender

6

well was painted black instead of white; and the presence of too much metal inside the fender well. We agree with the district court that the sum of these modifications supports a finding of reasonable suspicion to justify the stop.

B.

Defendants Stanley and Stephenson next argue the district court erred in finding Sergeant Schneider had probable cause to search the truck at the time he lowered the tailgate to perform the "two-finger" test. Probable cause to search a vehicle exists if, under the totality of the circumstances, a fair probability exists that "the vehicle contains contraband or other evidence which is subject to seizure under the law." United States v. Mercado, 307 F.3d 1226, 1230 (10th Cir. 2002); United States v. Nielsen, 9 F.3d 1487, 1489-90 (10th Cir. 1993). An objective standard measures probable cause–whether the facts and circumstances within the officer's knowledge sufficiently warrant an officer of reasonable caution to believe contraband or evidence of a crime will be found. See Ornelas v. United States, 517 U.S. 690, 696 (1996); accord United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001). Thus, we evaluate probable cause in relation to the circumstances as they would appear to a prudent, cautious and trained police officer. See United States v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002).

We have previously held evidence of a hidden compartment when coupled with other suspicious circumstances can contribute to probable cause to search a vehicle. See e.g., United States v. Vasquez-Castillo, 258 F.3d 1207, 1213 (10th Cir. 2001) (concluding evidence of a hidden compartment coupled with officer's smell of raw marijuana provided

7

probable cause to search); <u>United States v. Anderson</u>, 114 F.3d 1059, 1066 (10th Cir. 1997) (concluding probable cause to search based on evidence of a hidden compartment coupled with slightly conflicting versions of travel plans and smell of air freshener). More recently and more importantly, we held that in certain instances evidence of a hidden compartment can *alone* give rise to probable cause to search a vehicle for contraband. <u>See</u> <u>United States v. Jurado-Vallejo</u>, 380 F.3d 1235, 1238 (10th Cir. 2004). Whether evidence of a hidden compartment can alone create probable cause, we explained, depends on two factors: (1) "the likelihood that there really is a hidden compartment" and (2) "the likelihood that a vehicle with a hidden compartment would, in the circumstances, be secreting contraband." <u>Id.</u>

Turning to the first factor, Sergeant Schneider's suspicion of a hidden compartment was heightened once he approached the truck on foot and observed a fresh weld between the bed and the cab of the truck. As he explained, the weld "just increased my suspicion of a false compartment . . . [b]ecause there shouldn't be a weld there at all." According to his testimony, he was sure the vehicle contained a false compartment based on his experience from searching other vehicles with similar modifications. Sergeant Schneider's training and experience in drug interdiction on the day in question was extensive. He had received training on identifying and locating hidden compartments through the Kansas Highway Patrol, and had been involved in approximately fifty cases where hidden compartments had been located. In approximately ten of those cases, the compartment was similar to the compartment in this case, and in one case it was identical. He further testified that in over ninety percent of the hidden compartments he investigated, he found contraband. The district

8

court credited Sergeant Schneider's testimony, and Defendants do not challenge this finding on appeal. Considering the totality of the circumstances, we conclude Sergeant Schneider had adequate reason to believe a strong likelihood existed that the truck had a hidden compartment underneath its bed.

As for the second factor–the likelihood the secret compartment contains contraband–we observed in Jurado-Vallejo that it was "not a concern" because "[i]f the vehicle had a hidden compartment, it was highly likely to contain contraband." We found "hard to conceive of a legitimate use of a large hidden storage compartment in any vehicle[.]" Id. at 1238-39. Furthermore, Sergeant Schneider testified that in his experience over ninety percent of hidden compartments concealed contraband. Accordingly, we agree with the district court Sergeant Schneider had probable cause to search the truck when he lowered the tailgate to perform the two-finger test.

C.

Last, Defendants Stanley and Stephenson argue the district court erred in finding probable cause to arrest them prior to the discovery of the drugs because Sergeant Schneider did not know what, if anything illegal, was in the compartment. This argument misses the point entirely. Probable cause is a matter of probability, not certainty. Probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243 n. 13 (1983). Because a "fair probability" is all the law demands, we do not require "greater proof-certainly not conclusive proof-of any particular factor establishing probable cause." Jurado-Vallejo, 380 F.3d at

9

1239. Probable cause to arrest exists if, under the totality of the circumstances, the facts and circumstances within the officer's knowledge are sufficient to justify a prudent officer in believing the defendant is engaged in an illegal activity. See United States v. Patten, 183 F.3d 1190, 1195 (10th Cir. 1999).

As we pointed out, a large hidden storage compartment in any altered vehicle has no legitimate use. See Jurado-Vallejo, 380 F.3d at 1238-39. Based on his observations of the physical modifications to the truck and his prior experience investigating hidden compartments, Sergeant Schneider reasonably believed Defendants were transporting narcotics. The facts of this case amply support a finding that Sergeant Schneider had probable cause to arrest Defendants when he did. For instance, in United States v. Soto, 988 F.2d 1548, 1558 (10th Cir. 1993), we found probable cause to arrest the defendant "given [the officer's] conclusion that a secret compartment was present, and the likelihood it contained contraband." Similarly, in United States v. Arango, 912 F.2d 441, 447 (10th Cir. 1990), we concluded an officer had probable cause to arrest based on his discovery of "evidence indicating that the truck had a hidden compartment running underneath the bed" and an inadequate amount of luggage for a two-week vacation. This case is no different. We agree with the district court's determination that Sergeant Schneider had probable cause to arrest Defendants prior to subjecting the truck to a canine sniff.[2]

_____

[2] While our case law is undoubtedly clear on this point of law, even assuming Defendants' argument that their arrest was premature has merit, Sergeant Schneider had probable cause to detain Defendants for safety purposes. In such a case, Defendant's

(continued...)

10

III.

Finally, we address Defendant Stanley's challenge to his sentence. Prior to sentencing

Stanley sought a two-level downward adjustment to his base offense level pursuant to the

safety-valve adjustment of U.S.S.G. § 2D1.1(b)(6). The 2003 version of § 2D1.1(b)(6) read:

"If the defendant meets the criteria set forth in subdivisions (1)-(5) of subsection (a) of

§ 5C1.2 . . . decrease by 2 levels."[3] See also 18 U.S.C. § 3553(f). The Government agreed

Stanley met the criteria of subsections (1) through (4), but not (5). Subsection (a)(5) requires

that "not later than the time of the sentencing hearing, the defendant has truthfully provided

to the Government all information and evidence the defendant has concerning the offense or

offenses that were part of the same course of conduct or of a common scheme or plan . . . ."

In an attempt to satisfy the requirements of subsection (5), Stanley provided the

Government with a "proffer letter" describing the events surrounding Defendants' trip to

Arizona. The letter also stated that Stanley was willing to provide additional information if

the Government deemed the proffer insufficient to satisfy the safety-valve's disclosure

requirement. At sentencing, the Government opposed the adjustment, arguing Stanley's

---

[2](...continued)
arrest was harmless. See United States v. Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998) ("Police officers are authorized to take reasonable steps necessary to secure their safety and maintain the status quo during the stop" including the use of handcuffs when "probable cause or when the circumstances reasonably warrant such measures.") (quotation and citation omitted).

[3] The district court sentenced Stanley pursuant to the 2003 edition of the United States Sentencing Guidelines Manual. All citations to the guidelines refer to the 2003 edition, unless specified otherwise. In the 2004 and 2005 versions of the sentencing guidelines, the relevant provision, § 2D1.1(b)(6), appears at § 2D1.1(b)(7).

11

proffer letter did not satisfy U.S.S.G. § 5C1.2(a)(5). The Government conceded Stanley's proffer letter did not contain any false statements, but argued the proffer did not meet the disclosure requirement because "[i]t doesn't mention anything essentially related to a broader conspiracy and the other acts or the other participation that Mr. Stanley may have made or may have been involved in this conspiracy."

In support of its position, the Government introduced a "Report of Investigation" consisting of an interview between a DEA Agent and Stanley's former cell-mate. The report details a conversation Stanley had with his cell-mate during which Stanley told him, among other things, that "Stephenson's brother-in-law . . . owned a construction company in Maryland that . . . receiv[ed] the shipments of cocaine and marijuana" and "that he [Stanley] had been involved in transporting 60 to 70 kilograms of cocaine and 500 pounds of marijuana once a month for approximately one year." The district court denied the safety-valve adjustment finding Stanley had not carried his burden because he "[had] not truthfully disclosed to the government all he knows about the offense of conviction or relevant conduct."

The defendant bears the burden of proving by a preponderance of the evidence that he is entitled to the safety-valve adjustment. See United States v. Patron-Montano, 223 F.3d 1184, 1189 (10th Cir. 2000). Stanley argues he satisfied the disclosure requirement of subsection (a)(5) in two ways: First, he contends his proffer letter constituted a truthful and complete account of his offense conduct and relevant conduct as it pertains to the charged offense. Second, he contends he satisfied the disclosure requirement because his proffer

12

letter offered to provide more information upon the Government's request. We review the district court's determination of eligibility for relief under § 5C1.2(a) for clear error. See United States v. Roman-Zarate, 115 F.3d 778, 784 (10th Cir. 1997). Our review is de novo to the extent the district court interpreted the scope and meaning of § 5C1.2(a). United States v. Acosta-Oliva, 71 F.3d 375, 377 n. 3 (10th Cir. 1995). In conducting our review, "[w]e are cognizant that the district court's application of the safety valve is fact specific and dependent on credibility determinations that cannot be replicated with the same accuracy on appeal." United States v. Virgen-Chavarin, 350 F.3d 1122, 1129 (10th Cir. 2003).

A.

After reviewing the record before us, we are left with the firm impression Stanley was less than forthcoming in his proffer letter. The scope of disclosure required under subsection (a)(5) is very broad. See Acosta-Oliva, 71 F.3d at 378. Subsection (a)(5) requires a defendant to truthfully disclose to the Government "*all information and evidence*" the defendant has about the "offenses that were part of the same course of conduct or of a common scheme or plan . . . ." (emphasis added). The phrase "offense or offenses that were part of the same course of conduct or of a common scheme or plan" is defined as "the offense of conviction and all relevant conduct." § 5C1.2, comment. (n. 3). The Government concedes on appeal the proffer letter constitutes a full admission of his offense conduct, but maintains that it does not constitute a complete admission of Stanley's relevant conduct. The guidelines define relevant conduct as, among other things, "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" that

13

"occurred during the commission of the offense of conviction . . . ."  U.S.S.G. § 1B1.3(a)(1)(B).

When the offense involves conspiracy or a jointly undertaken criminal venture, we require the defendant to disclose not only everything he knows about his own actions, but also everything he knows about his co-conspirators.  Acosta-Oliva, 71 F.3d at 378; see also United States v. O'Dell, 247 F.3d 655, 675 (6th Cir. 2001) ("Application of the safety valve provision not only requires a defendant to admit the conduct charged, but it also imposes an affirmative obligation on the defendant to volunteer any information aside from the conduct comprising the elements of the offense.") (internal quotations and citation omitted); United States v. Sabir, 117 F.3d 750, 753 (3d Cir. 1997) (holding subsection (a)(5) requires a defendant to "reveal a broader scope of information about the relevant criminal conduct to the authorities").  The disclosure must "not merely [be] truthful but also complete." United States v. Salazar-Samaniega, 361 F.3d 1271, 1277 (10th Cir. 2004).

According to the indictment, Stanley pled guilty to conspiring with Stephenson, and "*other persons*, the identities of which are unknown to the grand jury," to possess cocaine with the intent to distribute.  His proffer letter, however, failed to disclose the roles and identity of other participants.  Notably, Stanley omitted in his proffer letter any reference to Stephenson's brother-in-law's involvement in the joint criminal enterprise.  The Government's evidence indicates Stephenson's brother-in-law owns a construction company in Maryland that served as headquarters for the criminal enterprise.  As Stanley disclosed to his cell-mate, Stephenson's brother-in-law's construction company "is receiving the

14

shipments of cocaine and marijuana." Stanley and Stephenson were most likely returning to this location when they were detained in Kansas.

Moreover, in his proffer letter Stanley attempted to minimize his role in the conspiracy. He wrote he "didn't participate in the loading or receive instructions about the trip, other than from Stephenson. He relied on Stephenson to know the instructions and details of this trip. Stephenson handled the communication with the people in Maryland, although Mr. Stanley saw them." To say the least, we are very skeptical of Stanley's professed lack of knowledge regarding the conspiracy's other participants. The Government's evidence indicates this larger criminal enterprise had previously entrusted Stanley with transporting 60 to 70 kilograms of cocaine and 500 pounds of marijuana once a month for approximately a year. We think it highly unlikely Stanley did not know the identities of those individuals who were involved in assisting Stanley and Stephenson. Stanley's apparent omissions and incomplete statements lead us to conclude the district court did not commit clear error in denying him the safety-valve adjustment. See United States v. Wren, 66 F.3d 1, 3 (1st Cir. 1995) (denying safety-valve adjustment where the defendant "did not provide the government with all of the information and evidence he had concerning the very crime to which he pleaded guilty").

B.

Alternatively, Stanley argues his offer to provide additional information *upon the Government's request* satisfied the disclosure requirement even if his proffer did not. The Government never sought additional information from Stanley. Stanley contends he should

15

not be penalized for the Government's failure to cooperate. In <u>Acosta-Oliva</u>, we construed the language of § 5C1.2(a)(5) to "*require a defendant to disclose*" all that he knows concerning his involvement in the crime and the involvement of any co-conspirators. 71 F.3d at 379 (emphasis added). But we have not previously considered the question of whether the Government, having been given notice of a defendant's willingness to provide additional information, has a duty to solicit that information from the defendant.

Other circuits that have considered this issue have held, for varying reasons, that no such duty exists. In <u>O'Dell</u>, 247 F.3d at 675, the defendant filed a motion seeking from the Government a "notice of any further information or evidence the government . . . [would consider] necessary to fulfill the safety valve provision." The Sixth Circuit decided "[t]he government has no obligation to solicit information that could help the defendant meet the requirement for the safety valve." <u>Id.</u> In <u>United States v. Ivester</u>, 75 F.3d 182, 184-85 (4th Cir. 1996), the Fourth Circuit rejected the defendant's suggestion § 5C1.2(a)(5) "be construed to place on the Government the onus of seeking out defendants for debriefing." According to the court, such a construction would "obviate the requirement that defendants 'provide' information." In <u>United States v. Flanagan</u>, 80 F.3d 143, 146 (5th Cir. 1995), the Fifth Circuit interpreted the language of the safety-valve disclosure provision as placing "the burden . . . on the defendant to provide the Government with all the information and evidence regarding the offense." The court found "no indication that the Government must solicit the information." <u>Id.</u> Finally, the Second Circuit in <u>United States v. Ortiz</u>, 136 F.3d 882, 884 (2d Cir. 1997) relied on the analysis in <u>Ivester</u> and <u>Flanagan</u> to hold a defendant has the

16

burden to come forward with information that qualifies for the safety valve. The Second Circuit concluded the Government does not have a duty to solicit information from the defendant.

We join the Second, Fourth, Fifth, and Sixth Circuits and conclude the Government had no obligation to seek information from Stanley despite his offer to provide additional information. The plain language of subsection (a)(5) unequivocally requires "an affirmative act by the defendant truthfully disclosing all the information he possesses that concerns his offense or related offenses." United States v. Adu, 82 F.3d 119, 124 (6th Cir. 1996). A defendant's affirmative duty to "*provide* to the Government *all* information and evidence" cannot, by the very words of the statute, be met by only disclosing *some* information and making the rest available at the request of the Government. The safety valve's disclosure provision requires a defendant to "provide" information. This term would be rendered meaningless if a defendant could qualify for the safety-valve adjustment by simply opening his mouth and expressing a willingness to provide information. The purpose of the safety valve is to benefit "only those defendants who truly cooperate[.]" United States v. Schreiber, 191 F.3d 103, 106 (2d Cir. 1999). Stanley did no more than merely express his willingness to provide additional information. This falls short of being the type of "affirmative conduct" contemplated by the language of the disclosure provision, and has the practical effect of shifting the responsibility of satisfying the disclosure requirement to the Government. Thus, we hold the onus is on the defendant to come forward with all information he has concerning his relevant conduct.

17

In a last attempt to persuade us, Stanley argues this case is similar to United States v. Brack, 188 F.3d 748 (7th Cir. 1999). In Brack, the defendant provided the Government a statement regarding his involvement in a drug conspiracy *and made a written request to submit to a debriefing*. Id. at 762-763. The Government declined to interview the defendant because it did not believe the truthfulness of the defendant's statements. Id. at 763. The district court denied the defendant's safety-valve adjustment finding the defendant had not provided the Government with all the evidence he possessed. Id. at 762-63. The Seventh Circuit reversed. The court held the defendant's written statements (if truthful) combined with his request to meet with the Government, satisfied the safety-valve disclosure requirement. The court noted the district court based its decision on the incompleteness of the defendant's statements, and reasoned the Government "could not complain of incompleteness when it refuses to allow [the defendant] to finish telling his story" by rebuffing his invitation to interview him.

Unlike in Brack, Stanley never requested an interview with the Government.[4] Stanley merely made a statement of willingness. In Brack, the court explained that "a defendant cannot satisfy the disclosure requirement *simply by notifying the court of his willingness to*

_____

[4] Stanley alleges in his brief that Brack is analogous because the Government "refuse[d] from the outset" to meet with him. Stanley does not cite to the record to support this allegation. We have been abundantly clear that a party before this Court bears the responsibility of tying the relevant facts to the record in order to carry the burden of proving error. See United States v. Rodriguez-Aguirre, 108 F.3d 1228, 1238 n. 8 (10th Cir. 1997). This Court has no responsibility to "sift through" the record to find support for the claimant's arguments. See SEC v. Thomas, 965 F.2d 825, 827 (10th Cir. 1992).

18

*submit to a safety valve interview*." Id. at 763 (citing Ortiz, 136 F.3d at 884; Adu, 82 F.3d 119, 124 (6th Cir. 1996); and Ivester, 75 F.3d 184-85) (emphasis added). Thus, Brack does not aid Stanley. In contrast with the present case, the defendant in Brack "acted affirmatively by inviting the government (in writing) to interview him." Id. Such was not the case here.

To the extent Brack can be read to hold the Government's refusal to interview a defendant at the defendant's request conclusively satisfies the disclosure requirement of the safety-valve provision, we decline to follow Brack. We hold today that the defendant bears the responsibility to come forth with all evidence and information he has concerning his offense and relevant conduct. We agree with the Second Circuit that the Government has "no general obligation" to grant a defendant a debriefing. Schreiber, 191 F.3d at 108. And although the Government's cooperation would always be helpful to a defendant seeking to satisfy the disclosure requirement of the safety valve, such cooperation is legally unnecessary for a defendant to comply with the statute's disclosure requirement. As we discussed *infra*, § 5C1.2(a)(5) *requires a defendant to disclose* the information he has in his possession. In this case, Stanley knew he withheld information from the Government in his proffer and was at liberty to disclose such information in subsequent proffers if he so desired. Stanley took a gamble and his gamble did not pay off. Accordingly, we agree with the district court that Stanley's offer to provide additional information upon the Government's request did not satisfy the safety-valve disclosure requirement.

AFFIRMED.