**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 13, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RAYSEAN ALLEN WILLIAMS,

Defendant-Appellant.

No. 06-1297

(D.C. No. 05-CR-506-WDM-01)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **MURPHY, BALDOCK**, and **HOLMES**, Circuit Judges.

After a Colorado Springs police officer discovered a gun while searching Defendant Raysean Williams incident to an arrest, a grand jury indicted him on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Defendant moved to suppress the firearm. According to Defendant, the officer did not have probable cause to arrest him in the first instance. After the district court orally denied his motion to suppress, Defendant entered a conditional guilty plea and reserved his right to appeal the district court's order. See Fed. R. Crim. P. 11(a)(2). Defendant now appeals. We have jurisdiction pursuant to 28

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

U.S.C. § 1291. We review the district court's determination of probable cause de novo and its findings of historical fact upon which such determination is based for clear error. See United States v. Gordon, 173 F.3d 761, 765 (10th Cir. 1999). Applying these standards, we affirm.

I.

The relevant historical facts are taken from the transcript of the suppression hearing. On October 15, 2005, Colorado Springs Police Officer Scott Carnes was dispatched to the Ramada Inn. Kevin Beiker, the motel's front desk clerk, reported housekeeping had found a gun and drugs in room 128. The housekeeper, Maria Herrera, informed her housekeeping supervisor, Felicia Peake, who in turn informed Beiker. While en route to the motel, Officer Carnes learned from dispatch that one Walter Turner was the individual who checked into room 128 the prior evening. Dispatch relayed that an individual, described as 5 feet 9 inches tall, in his forties, and wearing a white T-shirt and dark pants, appeared at the motel's front desk and demanded return of the contraband.

When Officer Carnes arrived at the motel Beiker gave him a copy of the Colorado identification card Turner presented upon check-in. Officer Carnes, accompanied by Officer Joe Brown, began looking for Turner. Officer Carnes encountered a man wearing a black T-shirt and blue pants. The officer asked him if he was staying at the motel and, if so, in which room. The man answered he was staying in room 228. Officer Carnes asked for identification. The man presented a

Colorado identification card identifying him as Walter Turner. The record reflects Turner is 5 feet 11 inches tall and weighs 200 pounds. He is in his early forties and lacks a muscular build.

When questioned about the motel's records indicating he rented room 128, Turner admitted he rented room 128 but stated he spent the night in room 228 with a woman. Turner also indicated that no one, other than himself, had access to room 128. Turner, along with Officers Carnes and Brown, returned to the front desk. Officer Carnes asked Beiker if Turner was the man inquiring about the gun and the drugs earlier that morning. Beiker said he was not sure. Beiker stated he thought the man asking about the contraband was shorter and was wearing a light-colored shirt. Beiker's answers gave Officer Carnes the impression that Turner was not the man who asked about the gun and drugs.

After their conversation with Beiker, Officers Carnes and Brown searched room 128 per Turner's consent. Thereafter, they again questioned Beiker. Beiker stated he believed the man who asked about the gun and drugs was bald and had a muscular build. Beiker thought the man had a scar or scars on his forehead. Again, Beiker's description gave Officer Carnes the impression Turner was not the man asking for the gun and drugs. Even though Beiker could not identify Turner as the individual the officers were seeking, they arrested him because he indicated no one other than himself had access to the room where the gun and drugs were found.

Meanwhile, Detective Mark Robertson, also of the Colorado Springs Police

Department, became involved in the investigation. Officer Carnes briefed Detective Robertson on the recent events. Detective Robertson conducted two interviews with Turner who vehemently denied ownership of the gun and drugs found in room 128. Then, on October 19, 2005, Detective Robertson received a phone call from an anonymous woman, who he later learned was Turner's sister, Beatrice. Beatrice stated the police had the wrong person in custody. She told Detective Robertson she overheard her boyfriend, Troy Sago, bragging on the phone that the gun and drugs found in the motel room belonged to him.

After the anonymous phone call, Detective Robertson prepared two photo lineups. The first lineup included a photo of Troy Sago and the second included a photo of Turner. Detective Robertson, along with Special Agent Shaw, took the lineups to the Ramada Inn. They first questioned Maria Herrera, the housekeeper who found the items in room 128. The officers learned from Herrera, through Officer Shaw who speaks Spanish, that she was confronted by the man seeking the return of the gun and drugs before he went to the front desk and confronted Beiker. The officers asked Herrera to identify the man from the photo lineups. In the lineup featuring Sago, she said Sago was definitely not the man who had confronted her. In the line-up featuring Turner, she stated the man looking for the gun and drugs was younger than Turner.

Detective Robertson also interviewed Beiker. Beiker described the person who asked him about the gun and drugs as between 5 feet 7 inches and 5 feet 9

4

inches tall, in his 20's or 30's, and either bald or very closely shaven with a scar on his forehead and a muscular build. Beiker stated he was certain Turner was not the man asking about the gun and drugs. Detective Robertson also showed Beiker the lineups. Beiker did not identify either Sago or Turner as the man asking for the return of the items.

On October 22, 2005, Detective Robertson received a phone call from Felicia Peake, the motel's housekeeping supervisor. Peake informed the detective that the individual who demanded the return of the gun and drugs had just checked into the motel. Detective Robertson went to the motel and first spoke with Beiker. Beiker told Detective Robertson that the man who had just checked in was definitely the man who demanded the gun and drugs on October 15th. In particular, Beiker stated he remembered the scar on the Defendant's forehead and his defined muscles. Beiker provided Detective Robertson with a copy of the man's identification and told the detective the man was in room 133. Detective Robertson noticed the address listed on Defendant's identification card was only two or three blocks from the motel. The identification card described Defendant as 5 feet 9 inches tall, 200 pounds, and 38 years old. Detective Robertson unsuccessfully attempted to contact Defendant. The detective asked Beiker to notify him when Defendant returned.

The next morning, Detective Robertson arrived at the motel to check if Defendant had returned to his room. While Detective Robertson was looking around the parking lot, Felicia Peake contacted him and pointed out the vehicle Defendant

5

drove to the motel. Detective Robertson retrieved the license plate number, drove to a nearby substation, ran the license plate, and discovered the car was a rental. While at the substation, Detective Robertson learned Defendant's criminal history reflected a drug distribution charge. Detective Robertson tried to verify the address listed on Defendant's identification by contacting the utility companies. The detective was unable to verify the address.

After Detective Robertson conducted record checks, he called Officer Carnes. The detective informed the officer that the man inquiring about the gun and drugs the previous week had returned to the Ramada Inn. Detective Robertson asked Officer Carnes to go to the motel and make contact with Defendant. Officer Carnes and Officer Adam Sandoval went to the motel and knocked on the door of room 133. Several seconds after they knocked, Defendant opened the curtains and asked the officers what they wanted. Officer Carnes responded that the officers needed to talk to him. Defendant told the officers to wait a second and closed the blinds. Officer Carnes heard several thuds coming from inside the room before Defendant reappeared at the door. He again asked the officers what they wanted. Officer Carnes repeated they needed to speak with him. Defendant again told them to wait a minute. After another 30 seconds, Defendant opened the door just enough to exit the room.

Officer Carnes told Defendant he had information Defendant inquired about a gun and some drugs found at the motel the week before. Instead of denying

6

knowledge of the situation, Defendant asked Officer Carnes where he received such information. Officer Carnes explained the police frequently get tips regarding criminal activity. Officer Carnes then asked if he could go inside the room to talk to Defendant and look for weapons. Defendant declined. The officers returned to their cars where they contacted Detective Robertson and asked him to meet them across the street from the motel.

Officer Carnes reported his conversation with Defendant to Detective Robertson. The detective communicated that Beiker had positively identified Defendant as the individual who asked about the gun and drugs on October 15th. Detective Robertson told the officers to return to the motel and arrest Defendant. As instructed, Officers Carnes and Sandavol returned to the motel. They spotted Defendant approaching a vehicle outside room 133. Officer Carnes approached Defendant and told him he needed to speak with him again. Officer Carnes asked Defendant if he had any weapons on him. Defendant did not answer the question. Officer Carnes then patted Defendant down and place him under arrest. In the process the officer found the gun that became the subject of the indictment. After Defendant's arrest, Detective Robertson questioned him about his whereabouts on October 15, 2005. Defendant reported he was on a plane to Los Angeles on the morning of October 15th.

## II.

For purposes of the suppression hearing, the parties stipulated Defendant was

indeed on a plane to Los Angeles on October 15th and Beiker had mistaken Defendant for the person demanding the return of the gun and drugs. Thus, the only issue before us is whether the district court properly held that Officer Carnes had probable cause to arrest Defendant at the time he did so. We easily conclude the court properly so held. Probable cause to arrest exists if the facts and circumstances within the officer's knowledge are sufficient to justify a prudent officer in believing the defendant committed or is committing an offense. See United States v. Stephenson, 452 F.3d 1173, 1178 (10th Cir. 2006). Probable cause only requires a fair probability of criminal activity, not a prima facie showing of such activity. See Illinois v. Gates, 462 U.S. 213, 243 n. 13 (1983). The law requires no "greater proof – certainly not conclusive proof – of any particular factor establishing probable cause." United States v. Jurado-Vallejo, 380 F.3d 1235, 1239 (10th Cir. 2004). We determine probable cause from the totality of the circumstances taking into account both inculpatory as well as exculpatory evidence. See Stephenson, 452 F.3d at 1178.

Several factors inform our conclusion that the district court properly held Officer Carnes had probable cause to arrest Defendant. At the time of Defendant's arrest, Beiker had positively identified Defendant as the individual who asked about the gun and drugs on October 15th. Detective Robertson relied on Beiker's identification when he decided to order Defendant's arrest. Officer Carnes knew of that identification. See United States v. Matthews, 615 F.2d 1279, 1284 n.5 (10th Cir. 1980) ("It is well settled that an officer may rely upon his fellow officers to

8

supply the information which forms the basis of the arresting officer's reasonable grounds for believing that the law is being or has been violated."). We are convinced Detective Robertson's reliance on Beiker's identification was reasonable. We have stated that "when examining informant evidence used to support a claim of probable cause for a . . . warrantless arrest, the skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness." Easton v. City of Boulder, 776 F.2d 1441, 1449 (10th Cir. 1985); see generally 2 Wayne R. LaFave, Search and Seizure § 3.4(a), at 209-11 (3d ed. 1996) (explaining that "when an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case"). Because Beiker was an "ordinary citizen witness," we may lower the scrutiny we apply to Detective Robertson's reliance on Beiker's identification. Yet even absent the lower level of scrutiny, we would conclude Detective Robertson reasonably relied on Beiker's identification.

First, we note Beiker was definitive about his identification of Defendant. According to Detective Robertson's testimony at the suppression hearing, Beiker used the words, "this is definitely him." The detective stated Beiker seemed "100 percent sure that this was the gentleman." Not only was Beiker positive about his identification, Beiker was specific about the consistencies between the man he

9

encountered on October 15th and Defendant. In particular, Beiker identified Defendant's defined muscles and the scar on Defendant's forehead as consistent with the individual he encountered on October 15th. Also, Beiker's description of the man seeking the gun and drugs was largely consistent throughout the investigation. Beiker's description was not vague, but instead was detailed and included descriptions of the man's physique, his hair cut, and the scars on his face. That two other individuals, Sago and Turner, were possible suspects does not make Detective Robertson's reliance on Beiker's identification of Defendant unreasonable. No one identified Sago or Turner as the individual who asked for the contraband on October 15th, and neither of them matched the description which Beiker provided. Defendant, however, did match that description.

In addition to Beiker's identification, several other factors support the district court's probable cause determination. First, Defendant's identification card indicated he lived only a few blocks from the Ramada Inn. Detective Robertson testified that in his experience, drug dealers often do not conduct their business directly out of their homes. Instead, they "get a motel room for a night or whatever and conduct their business, so . . . not to let police know where they reside." Second, the fact Defendant was driving a rental car added suspicion considering he only lived a couple of blocks from the motel. Third, Detective Robertson knew Defendant had a prior drug distribution conviction.

Defendant's strange behavior during Officer Carnes visit to his room further

10

added to police suspicion. Defendant gave the appearance he was hiding something by asking the police twice what they wanted, waiting some time to come to the door, causing loud bangs or thuds from inside the room, and opening the door only enough to squeeze himself out of the room. When Officer Carnes confronted Defendant with the information that someone had told them he was asking about the gun and the drugs a week earlier, Defendant did not deny it was him, but instead asked where the officer had received the information. All these factors, along with Beiker's identification, lead us to conclude the facts within the knowledge of Officer Carnes gave him probable cause to arrest Defendant. Because Officer Carnes found the weapon on Defendant's person during a search incident to a lawful arrest, the district court properly denied Defendant's motion to suppress. See United States v. Anchondo, 156 F.3d 1043, 1045-46 (10th Cir. 1998).

AFFIRMED.

Entered for the Court,


Bobby R. Baldock
Circuit Judge