PHILLIPS, J.,
concurring in the judgment.
On September 15, 2008, Trooper Cham-berlin Neff parked his patrol car in the median on Interstate 80 near Salt Lake City to monitor traffic. He had recently joined the patrol’s drug-interdiction team and had a drug dog with him. The trooper saw Wiley’s 2002 Toyota Tundra truck drive past him, and he ran its Missouri license-plate number to check its registration.
While patrolling roadways, the trooper often accessed his computer database to check the registration of automobiles with non-Utah license plates. He testified that the database usually returned a name and address for the registered owner. He said that he had previously received returns identifying registered owners from Missouri and other states. He believed that his computer was linked to Missouri’s department of motor vehicles.
But this time, as sometimes happened, a search of the computer database didn’t reveal whether the truck was registered or unregistered. Instead, it identified the plate as “not on file.” Apparently, after dispatch got the same return of “not on file,” the trooper stopped Wiley’s truck to *821 investigate its registration.[1]
Upon stopping Wiley, the trooper made a beeline for the truck’s passenger door.[2] On his way, he didn’t slow down to look at the plate but appeared to glance at it on his way past. As shown by a photo taken at the stop, the light-colored Missouri license plate looked brand new — it was shiny, clean, unbent, and unscratched— and it bore a permanent mark of “SEP” (for September) as well as a' conspicuous yellow tab numbered “09” (for year 2009) in the middle of the plate. The tab was a registration sticker issued annually after payment of fees. Nothing about the plate or tab suggested any alteration or tampering. The trooper testified that he didn’t even look at the registration tab to see the year printed on it or to see whether it was a registration for the truck.[3]
After Wiley rolled down the passenger window three or four inches, the trooper asked through the crack if he could open the passenger door. Wiley said no. The trooper asked Wiley if he had his driver’s license and was told yes. The trooper then asked where Wiley was going and why. He also asked whether Wiley had been on the road long. Finally, he said, “Tell you what. Grab your license, your registration and come on back to my car, ok?” Government Ex. 19 at 1:53-55. As he passed the back of the truck, the trooper again appeared to glance at the plate while walking by it, but he didn’t bend or move closer to examine it. He stood at the rear of the driver’s side of the truck staring forward and awaited Wiley. Plainly, nothing about the plate or tab sparked the trooper’s interest.
Wiley took a few moments to collect his documents and then accompanied the trooper to the patrol car. Once inside, the trooper told Wiley that he’d stopped him because his registration didn’t return on file. Wiley responded, “Oh, that’s no problem. Here. I just bought it.” Id. at 2:46— 50. He provided the trooper with his “original motor vehicle title receipt” for the truck, which the State of Missouri had issued to him just seven days before. He also handed the trooper his driver’s license and his insurance card for a different automobile (which he said also covered the truck). The trooper then asked more questions about the people Wiley planned to visit in Los Angeles. During this questioning, the trooper interjected, “Are you nervous?” Id. at 3:20-21. After this, he relayed to dispatch Wiley’s driver’s license number and VIN and asked dispatch for Wiley’s criminal history.
As the trooper awaited results from dispatch, he continued to question Wiley about his trip, his preferences in roadside scenery, his work, his finances, his criminal history, his truck purchase, and his aunt and friend in Los Angeles. About seven minutes later, the dispatcher reported that she was “still not able to get anything to come back, even with the VIN.” Id. at 11:23-27. She said that the driver’s license was valid and reported Wiley’s criminal history as a “prior arrest in 2001 for marijuana possession and paraphernalia possession.” Id. at 11:50-12:15.
*822 Although dispatch had by then reported back on all sought information, the trooper still kept Wiley in the patrol car while he had the dispatcher call Wiley’s friend and aunt. While dispatch made the calls, the trooper quizzed Wiley about his marijuana conviction, whether he had recently used marijuana, and his recent truck purchase. After trying to reach the aunt and friend, the dispatcher reported back that she was “getting a message that it’s a wireless, uh, Verizon wireless cell and that the customer isn’t available right now.” Id. at 13:38-46, 14:45-53. Only after this did the trooper return Wiley’s driver’s license and title receipt.[4] Seconds later, the trooper reclaimed Wiley’s title receipt. With it in hand, he went to the truck and confirmed that the VIN on the title receipt matched the VIN visible on the truck’s dashboard. Having done that, he then opened the driver’s door, crouched down beside it, and confirmed (unsurprisingly) that the VIN etched on the inside door frame matched the others.[5] After that, the trooper for a second time returned the title receipt to Wiley, this time telling him to travel safety-
After Wiley had left the patrol car and was walking back to the truck, the trooper called out to him, requesting permission to ask additional questions. Wiley declined. The trooper told him he’d be a little bit longer, saying he believed there was criminal activity. After asking Wiley a series of questions, the trooper asked for consent to search the car, which Wiley refused. He then asked for consent to run the drug dog around the truck, to which Wiley responded, “No, sir, it’s not all right. I’d like to get going.” Id. at 17:18-22. The trooper replied that it was “definitely all right,” adding that he had sufficient suspicion to detain him. Id. at 17:22-28. After the dog alerted, the trooper searched the truck and found a large sum of cash and a small amount of marijuana.
The government filed a forfeiture action against the cash found during the stop. Wiley claimed ownership of the money and moved to suppress all evidence obtained from the search. The district court denied Wiley’s suppression motion, finding that the “not on file” return justified the stop for a possible registration violation. Further, the court found that the trooper had reasonable suspicion of drug activity to deploy the drug dog and that the dog’s alert gave probable cause to search the truck. Wiley appeals the denial of his motion to suppress.
DISCUSSION
1. Reasonable-Suspicion Principles
‘When reviewing a denial of a motion to suppress, this Court accepts the district court’s factual findings, unless they are clearly erroneous, and views the evidence *823 in the light most favorable to the government.” United States v. Trestyn, 646 F.Sd 732, 741 (10th Cir.2011). “[Credibility of the witnesses and the weight to be given the evidence together with the inferences, deductions and conclusions to be drawn from the evidence, are to be determined by the trial judge.” United States v. McSwain, 29 F.3d 558, 561 (10th Cir.1994). “While the existence of reasonable suspicion is a factual determination, the ultimate determination of the reasonableness of a search and seizure under the Fourth Amendment is a question of law reviewed de novo.” Trestyn, 646 F.3d at 741.
“[Shopping an automobile and detaining its occupants constitute a ‘seizure’ within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief.” Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), “certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime.” Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). “A routine traffic stop ... is more analogous to an investigative detention than a custodial arrest.” Trestyn, 646 F.3d at 742. When analyzing a traffic stop under Terry, we ask two questions: (1) Was the officer’s stop justified at its inception? And (2) was it reasonably related in scope to the circumstances that justified the interference in the first place? Id.
To justify a traffic stop at its inception, an officer must have reasonable suspicion of criminal activity — “a ‘particularized and objective’ basis for thinking unlawful activity is afoot.” United States. v. Esquivel-Rios, 725 F.3d 1231, 1236 (10th Cir.2013) (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). “The Fourth Amendment requires some minimal level of objective justification for making the stop.” United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (internal quotation marks omitted). “That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence.” Id. But it requires “something more than an inchoate and unparticularized suspicion or hunch.” United States v. Chavez, 660 F.3d 1215, 1221 (10th Cir.2011). In evaluating the validity of a stop based on reasonable suspicion, the Supreme Court directs that we consider “the totality of the circumstances — the whole picture.” United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The government bears “the burden before the district court of establishing by a preponderance of the evidence that reasonable suspicion supported the officer’s stop of [a] vehicle.” United States v. Burciaga, 687 F.3d 1229, 1230 (10th Cir.2012).
When an officer’s reasonable suspicion is dispelled before the officer asks for driving documents and questions the driver, the officer’s requests for information exceed the limits of a lawful investigative detention and violate the Fourth Amendment. McSwain, 29 F.3d at 561-62. “[R]easonable suspicion must exist at all stages of the detention, although it need not be based on the same facts throughout.” United States v. Soto-Cervantes, 138 F.3d 1319, 1322 (10th Cir.1998). In such circumstances, the officer may explain to drivers “the reason for the initial detention and then allow them to continue on their way without asking them to produce their driver’s license and registration.” McSwain, 29 F.3d at 562. The officer may not continue to question the driver. Id. at 561-62.
*824 In an ordinary traffic stop, the officer has witnessed a traffic violation and thus has probable cause (not just reasonable suspicion) to detain the driver. In that instance, as part of the traffic stop, the officer may ask questions about travel plans, “request a driver’s license and vehicle registration, run a computer check, and issue a citation.” United States v. Williams, 271 F.3d 1262, 1267-68 (10th Cir.2001) (speeding violation). But when, as here, an officer merely suspects a traffic violation, he may not continue to detain the driver for these purposes after reasonable suspicion has dissipated.
2. Reasonable Suspicion in This Case
A good place to begin our analysis is by asking what the trooper’s “not on file” return meant and didn’t mean. It didn’t mean that Wiley had committed a crime— unlike, say, a trooper’s radar screen showing a speed limit violation. Instead, it meant that for some reason — criminal or innocent — the database didn’t include Wiley’s license plate. Innocent reasons would include that Wiley had registered his truck so recently that Missouri had not yet entered it into its database, or that the trooper’s computer didn’t have access to Missouri’s database showing Wiley’s valid registration. Criminal reasons would include that Wiley had a fake or forged plate.
The parties and the district court focused on whether the trooper had reasonable suspicion of a crime at two discrete times — when he initiated the traffic stop, and when he detained Wiley to search the truck. This approach failed to appreciate that the reasonable suspicion requirement continues throughout the entire stop. It is not enough to have reasonable suspicion at the beginning and then at the end. See United States v. De La Cruz, 703 F.3d 1193, 1196-98 (10th Cir.2013). As explained below, I believe that the initial reasonable suspicion of a registration offense dissipated when the trooper saw or should have seen the truck’s recently issued, current license plate and registration tab, and reasonable suspicion that the truck was stolen dissipated when Wiley provided his “original motor vehicle title receipt” showing that he owned the truck. These events occurred long before the trooper built reasonable suspicion of drug-related activity.[6] When reasonable suspicion of these possible offenses dissipated, the trooper was obligated to release Wiley. When the trooper learned (or should have learned) that the facts no longer gave reasonable suspicion of these possible offenses, the once-valid stop needed to end. Without reasonable suspicion of a crime, nothing justified further prolonging the stop. Thus, the trooper had no right to continue to question Wiley in the patrol car after viewing both his recently registered license plate and registration tab and his “original motor vehicle title receipt.” And the trooper himself acknowledged that he had no reasonable suspicion of drug-related activity when he first sat Wiley in the patrol car.
I agree with the government that the trooper had reasonable suspicion to stop Wiley upon learning that the truck’s license plate was “not on file.” That gave reasonable suspicion that the truck may not be validly registered. See Esquivel-Rios, 725 F.3d at 1235 (“This court and others have regularly upheld traffic stops based on information that the defendant’s *825 vehicle’s registration failed to appear in a law enforcement database.... ”); cf. United States v. Cortez-Galaviz, 495 F.3d 1203, 1206 (10th Cir.2007) (finding reasonable suspicion when “the state database maintained for the purpose of recording vehicle insurance information contained no information suggesting that the owner of the Explorer had insured it”).
But upon stopping Wiley for this possible registration violation, the trooper needed to investigate why the database had reported the plate as “not on file.” Without unnecessary delay, the trooper needed to determine whether this “not on file” status arose from innocent or criminal acts. For the trooper to investigate the suspected crimes “without unreasonable delay,” I can’t see how he could ignore the very things that could dispel his reasonable suspicion — the newly issued, current license plate and registration tab together with Wiley’s “official motor vehicle title receipt.” See Royer, 460 U.S. at 500, 103 S.Ct. 1319 (“[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer’s suspicion in a short period of time.”).[7] I believe that had he done so he would have seen that he no longer had reasonable suspicion of a registration violation. Once he saw that, the trooper could only advise Wiley why he’d been stopped and allow him to proceed on his way.
Although none of our “display of registration” cases involved searches for registrations on computer databases, they still guide us about an officer’s need to investigate the suspected violation to keep an initial reasonable suspicion valid. See Trestyn, 646 F.3d at 743 (“Once [the trooper] approached the minivan on foot, he reasonably could have observed the registration number on the minivan’s license plate.”); United States v. Edgerton, 438 F.3d 1043, 1051 (10th Cir.2006) (“Once [the trooper] was able to read the Colorado tag and deem it unremarkable, any suspicion that Defendant had violated [Kansas law] dissipated.... ”); McSwain, 29 F.3d at 561 (“[The trooper] stopped Mr. McSwain for the sole purpose of ensuring the validity of the vehicle’s temporary registration sticker. Once [the trooper] approached the vehicle on foot and observed that the temporary sticker was valid and had not expired, the purpose of the stop was satisfied.”).[8]
Even though it was obvious that Missouri had issued Wiley’s license plate and registration tab no earlier than September 1, 2008 (a mere two weeks before the stop), and even though Wiley immediately explained the “not on file” report by providing his “original motor vehicle title receipt” showing that he had bought the truck a week before the stop, the government contends that the trooper always had reasonable suspicion that the truck wasn’t legally registered and might be stolen. In *826 support, it points to the trooper’s testimony that the “not on file” status raised a “laundry list” of possible criminal acts. In fact, the trooper’s list was a short one, with just two stated possibilities — that the license plate could be from the truck’s previous owner, or that the truck could be stolen. Elsewhere, while explaining why he had not looked at the “registration number on the license plate,” the trooper said, “You know, my experience has been with license plates, those stickers are easily torn off and put on other vehicles.” Appellant’s App. at 154-55. I will treat this as raising a third criminal possibility — that Wiley may have removed a registration tab from someone else’s Missouri plate and attached it to his own. I am unpersuaded that the government met its burden to show that any of these bases provided reasonable suspicion from the beginning of the stop until the dog’s sniff of the outside of Wiley’s truck. I note that while the trooper concluded that these suspected violations corresponded to a “not on file” return, he never explained how they did so.[9]
Before addressing the three offenses for which the government claims the trooper had reasonable suspicion throughout the entire stop, I pause to note two possible offenses the government doesn’t rely upon.
First, the government doesn’t contend that the trooper had reasonable suspicion that the plate or registration tab were forgeries. This is understandable after viewing the video of the stop — the trooper exhibited no concern that the plate or tab might be forgeries. While a “no return” from a computer database might well give reasonable suspicion of a forged temporary tag, see Esquivel-Rios, 725 F.3d at 1234-35, the trooper’s own conduct here shows that it didn’t give him reasonable suspicion that Wiley’s metal plate and registration tab were forged.
Second, the government doesn’t contend that the trooper had reasonable suspicion that the plate may have expired. The 2009 registration tab was affixed to the plate. And, in Missouri, “[a] tab or set of tabs issued by the director of revenue when attached to a vehicle in the prescribed manner shall be prima facie evidence that the registration fee for such vehicle has been paid.” Mo.Rev.Stat. § 301.130(6)(3). The Utah statute that the trooper was enforcing exempted from any registration requirement any “vehicle registered in another state and owned by a nonresident of the state.” Utah Code Ann. § 41-1 a-202(2)(a). I now turn to the three offenses the government contends justified the trooper’s prolonged investigation. The government argues that these possible violations gave the trooper reasonable suspicion to continue the stop until the trooper returned all of Wiley’s documents and released him.
First, the government contends that the trooper had reasonable suspicion that Wiley was using the plate of the truck’s previous owner without reregistering it. Even had Wiley been driving a truck still carrying his seller’s plate and registration, I see nothing in the record showing that a computer database search would have returned “not on file” rather than returning the seller’s name. And even had Wiley’s seller canceled his registration and unlawfully left the plate with Wiley, I see noth *827 ing in the record showing that a computer database search would have returned “not on file” rather than “unregistered.”
But even if the circumstances gave reasonable suspicion of a registration crime, that suspicion would quickly have dissipated. Even glancing at the Missouri plate on his way by, the trooper would have seen its new condition — shiny, clean, unbent, and unscratched. Had he looked more carefully (actually investigated the crimes he reasonably suspected), he would have seen that the plate bore a permanent mark of “SEP” (for September) as well as a conspicuous yellow registration tab numbered “09” (for year 2009).[10] He wasn’t free to ignore this significant information.
Objectively, the trooper should have known that the Missouri plate was issued in September (“SEP” on the plate) and expired a year later in September 2009. Because the license plate and tag had just been issued (which may have contributed to the trooper’s confusion that it was a new truck), it was unsurprising that the plate was shiny new and that the 2009 registration tab showed no portion, , of an earlier registration tab underneath it.
Because the plate and tag were no more than two weeks old, it made little sense that Wiley might have been driving on the previous owner’s plates and registration. That could occur only in the highly unlikely circumstance where the previous owner had paid to register the truck for a. year and then within hours or days sold it to Wiley. See United States v. Stephenson, 452 F.3d 1173, 1176 (10th Cir.2006) (in measuring reasonable suspicion we evaluate an officer’s conduct “in light of common sense and ordinary human experience”). Moreover, suspicion of this crime would leave unexplained why the computer database didn’t still have the plate registered under the previous owner’s name. What does make sense is that newly issued registrations take some time to be entered into motor vehicle databases. The trooper himself brought this up as a reasonable explanation.
Reading broadly a single sentence in the government’s brief, I think that the government might be suggesting that the trooper had a right to detain Wiley to run his VIN in a further effort to track the registration. Specifically, it said that “[e]ven after inputting the truck’s VIN through its computer system, dispatch could not find a registration.” Appellee’s Br. 5. If, by this, the government means that the trooper had a right to extend the stop for this additional database search, I must disagree for all the reasons above— by then reasonable suspicion of a registration violation had dissipated.
In addition, I wonder how the VIN search even supported the trooper’s investigation about the validity of the truck’s plate and registration tab. First, the government offered no testimony that VIN searches turn up more complete information than do license-plate searches. And, second, even if this VIN search had showed the plate “unregistered,” that would hardly have given probable cause to issue a citation for a registration offense when the truck bore a valid Missouri plate and active registration tab. Absent probable cause of a criminal violation, the trooper would have been left in the same position as he was with the “not on file” return — lacking any basis to hold or cite Wiley and needing to release him.
*828 Second, the government contends that the “not on file” report gave the trooper reasonable suspicion that the truck might be stolen. The problem here is that the government has not explained why a plate’s “not on file” status would correspond to an automobile’s being stolen. When an automobile is stolen, its plate surely remains of record. Officers have a vital interest in knowing what automobiles are stolen before approaching them. The government has failed to show that stolen automobiles would be more apt to return “not on file” than to return “registered” or “unregistered.” I see nothing suggesting that stealing a car, or even a plate,[11] would erase its previous database entry. Moreover, Wiley provided the trooper an “original motor vehicle title receipt” showing that he owned the truck. Nowhere did the trooper ever suggest that he thought this document was anything but legitimate. In fact, the trooper testified otherwise, saying “I didn’t have a violation. I believed the vehicle belonged to him and he had the proper paperwork, and I’m not going to write a ticket for nothing.” Appellant’s App. at 140. Along the same lines, the district court found that the title receipt “showed that [Wiley] had recently purchased the vehicle for $5,000.” United States v. $85,688.00, No. 2:09-CV-00029-DS, 2010 WL 1257634, at *1 (D.Utah Mar. 25, 2010).
Third, although I am unsure whether the government asserts this as a basis on appeal, I address the trooper’s testimony that registration “stickers are easily torn off and put on other vehicles.” Appellant’s App. at 155. I read this as the trooper’s saying that he might have had reasonable suspicion that Wiley removed the “09” registration tab from someone else’s plate and put it on his own. I’m unpersuaded. First, the trooper’s lack of interest in the registration tab at the roadside strongly suggests that he didn’t think that anyone had altered or tampered with the tab. Second, the photo of the plate shows that the tab was in an undamaged, pristine condition. And, third, as earlier explained, the plate was newly issued two weeks before the stop, so Missouri would have issued the plate with the 2009 tab on it. Accordingly, Wiley would have had no reason to scavenge for a tab to steal and stick to his newly issued plate.
In making these conclusions, I simply apply our rule that a stop must end when reasonable suspicion dissipates. Here, the trooper no longer had reasonable suspicion of a registration violation after seeing the current license plate and registration tab, and he no longer had any reasonable suspicion that the truck was stolen after receiving the “original motor vehicle title receipt” showing that Wiley owned the truck. Any vestige of suspicion after that wasn’t reasonable suspicion, but instead conceivable suspicion-otherwise best characterized as insufficient suspicion.
3. What Issues Are Properly Before Us For Decision
The dissent says that I am reversing the district court’s judgment on “an issue never presented by Wiley to, nor resolved by, the district court: whether Trooper Neffs suspicion of a temporary violation should have dissipated after Wiley, while sitting in Trooper Neffs patrol vehicle, provided Neff with ‘the original motor vehicle receipt’ for Wiley’s truck.” Dissent at 833. It goes on to say that I have “inject[ed a] *829 new issue[ ] into the case at this late juncture.” Id. at 834. As I understand it, the “new issue” is what effect Wiley’s presenting the trooper with the “original motor vehicle title receipt” had when considered under our rule that reasonable suspicion must exist throughout the entire stop. By considering the title receipt, I do no more than Wiley did below. In his memorandum supporting his motion to suppress, Wiley stated that he had “produced a title for the vehicle that showed that [he] had recently purchased the vehicle for $5,000.” Memorandum of Law in Support of Motion to Suppress Evidence at 2, $85,688.00, 2010 WL 1257634 (No. 2:09-CV-00029-DS, ECF No. 30). Wiley reasserted this point at the suppression hearing. There he vigorously cross-examined the trooper about the title receipt and how it showed that he owned the truck — contesting the new argument that the trooper had reasonable suspicion that the truck was stolen.[12] See Appellant’s App. at 134-36, 154. If Wiley wasn’t raising the importance of the title receipt as part of his challenge to reasonable suspicion, I don’t know what else he was doing.
I agree that Wiley could have more specifically argued this point below and on appeal. In response to the dissent’s criticism for considering the effect of the title receipt on appeal, I can only point to Wiley’s issue statement where, he says, in the district court he had “contended that his Fourth Amendment rights were violated by the officer who stopped his vehicle, detained him without consent, and searched his vehicle.” Appellant’s Br. at 2. While “violation of Fourth Amendment rights” is indeed a broad claim, I do see that Wiley later contended that his “papers satisfied [the trooper] that the vehicle was not stolen and that there was no violation for which [the trooper] could issue any ticket.” Id. at 8 n. 11. Everything considered, I feel the issue of the title receipt was raised sufficiently to fairly consider it on appeal.
I can’t agree with the dissent that Wiley’s allegedly failing to raise the title receipt issue sufficiently in the district court has prejudiced the government by inducing it not to broaden its litigation strategy there. Dissent at 833-34. As seen by its memorandum in the district court, the government acknowledged that the title receipt showed Wiley owned the truck: “[Wiley] did not have a vehicle registration for the truck, but instead handed Trooper Neff the vehicle title to the truck. The title showed that [Wiley] had recently purchased the truck for $5,000.” See Memorandum of Plaintiff in Opposition to Claimant’s Motion to Suppress Evidence at 2, $85,688.00, 2010 WL 1257634 (No. 2:09-CV-00029-DS, ECF No. 31). The district court found that the title receipt “showed that [Wiley] had recently purchased the vehicle for $5,000.” $85,688.00, 2010 WL 1257634, at *1. Neither erred. The title receipt showed what it showed.
In view of this, I can’t see any prejudice. The trooper himself testified that the title receipt had led him to believe that Wiley was the true owner of the truck. Admittedly, the trooper may have later backped-dled some from this testimony. While acknowledging that he didn’t believe the truck was stolen, the trooper said that he still checked the VIN number on the title *830 receipt against the VIN etched into the truck. The dissent characterizes this as the trooper’s attempting “to resolve his concerns regarding whether the vehicle was stolen.” Dissent at 834. In rejecting this, I consider three things. First, the trooper’s comparing the VIN numbers came as an afterthought — in fact, he had to reobtain the title receipt from Wiley after almost sending him on his way. Second, checking the VINs on the truck had an incidental benefit — the trooper, who suspected illegal drug activity, was then able to look into the truck’s windows and open the driver’s door. Already concerned about the air freshener being used to mask the odor of drugs, the trooper then could do his own sniff after he’d opened the door.
I can’t stretch it enough to treat the last-second VIN comparison as showing reasonable suspicion of a stolen truck. The trooper, wisely, didn’t suggest that Wiley may have forged his title receipt and used a different VIN than etched on the truck (keeping in mind that the trooper testified the title receipt appeared to be an official document from the State of Missouri). Nor did he seek to stretch it even further by suggesting that while the title receipt appeared valid Wiley may have stolen a truck made the same year, with the same make, model, and color as the one listed on the title receipt. At some point, reasonable suspicion loses its reasonableness. Third, if the trooper reasonably suspected that the truck may be stolen, I can’t see why he would wait so long before checking to see if the VINs matched. Rather than promptly doing that, he instead prolonged the stop to question Wiley in the patrol car while building a separate reasonable suspicion of illegal drug activity.

. Wiley didn't present evidence in the district court undermining the reliability of the database.

. We now order that the DVDs of the stop stipulated for filing by the parties on January 2, 2014, be filed as a part of this case file.

.From the photo of the plate, we can see but can’t discern other small printed letters or numbers on the registration tab. Wiley didn’t develop the record on what the printed characters are or what they mean. Accordingly, I can't tell whether the trooper could have verified that the truck was registered to Wiley with this information.

. During the stop, the trooper mistakenly referred to the receipt of title as the registration. With Wiley interjecting at points, the trooper said: "Ok. Here’s your registration back, and your insurance card back, uh, your driver’s license back. I mean, I pretty much, I just want to make sure it’s, that it's not stolen. Ok, can I see that real fast, your registration one more time? I’m going to go up and look at the car, at the VIN number of the car, and I'll be right back, ok?” Government’s Ex. 19 at 14:56-15:23. The trooper testified that he’d taken the title receipt to the truck to verify its VIN against that etched on the truck.

. Upon first encountering Wiley at the passenger door window, lowered slightly, the trooper saw among other things a Febreze air freshener can in the truck. He believed that this potentially indicated criminal conduct because air fresheners can mask the odor of drugs. He saw the Febreze can again when he looked through the windshield while confirming that the VIN on the dashboard matched the VIN on the title receipt.

. Had the trooper maintained reasonable suspicion of a crime throughout the stop until returning Wiley’s driving documents and allowing him to leave, I would agree with Chief Judge Briscoe for the reasons given in her dissent that the trooper had learned enough by then to have reasonable suspicion of illegal drug activity.

. I agree with Judge Ebel that this Royer quotation is directed at the need to minimize the length of the stop. Ebel Concurrence at 813-14. I think that to timely investigate the suspected offenses the trooper needed to examine — sooner rather than later — the key evidence that could dispel reasonable suspicion of the suspected crimes. In the context of this case, the trooper needed to look at the license plate, its registration tab, and the "official motor vehicle title receipt.” I don’t contend that the trooper needed to examine the license plate and registration tab before making the stop (as opposed to after the stop had begun). Id.

. I agree that these cases are not dispositive because none of them had the added feature of a "not on file” return. Their relevance is just as stated — they stand in part for the proposition that when troopers make stops based on suspected registration-related violations they can’t stretch out their stops by ignoring evidence of valid registration.

. I note that the district court never found that the trooper had reasonable suspicion of a stolen truck or of illegally borrowed or stolen plates. Instead, the district court generally concluded "that the stop of Mr. Wiley was justified at its inception and finds that the traffic stop was valid and legal based on reasonable suspicion of a motor vehicle violation.” United States v. $85,688.00, No. 2:09-CV-00029-DS, 2010 WL 1257634, at *3 (D.Utah Mar. 25, 2010).

. Because of the small size of the numbers, the trooper understandably didn’t see the ’'09” sticker when he called in the larger numbers on the license plate. But with the truck stationary before him, the trooper could not miss the registration tab or ignore its significance.

. I see nothing in the record supporting a conclusion that a stolen plate would yield a “not on file” return. For the same officer-safety reasons explained above, the plate would likely show as stolen, and, if not, would return registered to a different automobile — a tipoff that the automobile itself was stolen. Nothing like that happened here.

. I see nothing in the government's memorandum filed before the suppression hearing arguing that the trooper had reasonable suspicion of a stolen truck. Instead, I see the government acknowledging that "[t]he title showed that claimant had recently purchased the truck for $5,000." Memorandum of Plaintiff in Opposition to Claimant’s Motion to Suppress Evidence at 2, $85,688.00, 2010 WL 1257634 (No. 2:09-CV-00029-DS, ECF No. 31).